IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SOJITZ ENERGY VENTURE, INC. | § § | |
| v. | § § | CIVIL ACTION NO. 17-2941 |
| UNION OIL COMPANY OF CALIFORNIA | § § § § | |

## COMPLAINT

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff, SOJITZ ENERGY VENTURE, INC. ("Sojitz") files this Complaint against UNION OIL COMPANY OF CALIFORNIA ("Union"), and for cause of action would show the Court the following:

## PARTIES and SERVICE

1. SOJITZ ENERGY VENTURE, INC. is a Delaware corporation with its principal place of business located at 2000 West Sam Houston Parkway South, Suite 1450, Houston, Texas 77042.

2. Defendant UNION OIL COMPANY OF CALIFORNIA is a California corporation with its principal place of business located at 6001 Bollinger Canyon Road, San Ramon, CA 94583. Union is authorized to do business in Texas and may be served by serving its registered agent, Corporation Service Company d/b/a CSC Lawyers Inc. at 211 E. 7th Street, Suite 620, Austin, TX 78701.

4832-6407-0479v.1

## VENUE AND JURISDICTION

3. Federal jurisdiction is proper pursuant to 28 USC § 1332 because there is complete diversity between the citizenship of the entities involved and the amount in controversy exceeds $75,000.00. This Court also has jurisdiction under 43 U.S.C. § 1349(b)(1) because this case or controversy arises out of, or in connection with, an operation conducted on the Outer Continental Shelf in the Gulf of Mexico which involved exploration, development, or production of minerals.

4. This is a claim for amounts owed by Union on its liability for the decommissioning, plugging and abandonment of wells and facilities on federal offshore leases. Sojitz has performed all the work related to such actions and has directed all operations to complete the work from its offices in Houston, Texas.

5. Personal jurisdiction over the parties and venue, pursuant to 28 USC § 1391, are proper in the Southern District of Texas because 1) Union's principal place of business in Texas is located in Houston, Texas; 2) all or a substantial part of the events or omissions giving rise to the claims occurred in Houston, Texas; and 3) Union is subject to this Court's personal jurisdiction with respect to these claims.

6. Venue is also proper under 43 U.S.C. §1349(b)(1) because Union maintains offices in this District and/or because it is a judicial district of the State nearest the place where the cause of action arose.

4832-6407-0479v.1

## BACKGROUND

**A. Union Acquired Offshore Oil and Gas Leases from the United States and Accepted Primary Liability for All Decommissioning Obligations.**

7.     Union executed two oil and gas leases with the United States covering Gulf Bank blocks 142 and 186 (the "Leases," attached hereto as Exhibits 1 and 2, respectively). As the Lessee of Record, federal law imposed primary responsibility and liability upon Union for plugging any wells that might subsequently be drilled upon the Leases, removing any facilities or equipment that might be associated with such wells, and returning the area covered by the Leases to a condition found acceptable by the Bureau of Safety and Environmental Enforcement ("BSEE"), regardless of the terms of any subsequent assignments or contracts between Union and any other parties. See 250 C.F.R. §§ 1701, et seq. Union also agreed that it would be contractually responsible to the United States for such obligations (hereafter referred to as the "Decommissioning Obligations"). Specifically, Union's Leases stated: "*Within a period of 1 year after termination of this lease in whole or in part, the Lessee [Union] shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and Orders of the Director.*" [Emphasis added.]

**B. ATP acquired operating rights from Union, and agreed to assume Union's Decommissioning Obligations.**

8.     Union assigned the operating rights under its Leases, to a maximum depth of 6500 feet, to ATP. The agreement between Union and ATP (the "Union Agreement," attached as Exhibit 3) included the following terms:

* * *

ATP will indemnify and hold Union harmless from any and all risk or liability associated with ATP's operations on the Leases. All operations conducted under

3

the terms of this Agreement, shall be free of any cost and/or liability of any kind or character to Union, and all risk, liability, costs or expenses incurred in connection with drilling, testing, completing, and equipping said well or wells or plugging or abandoning said well or wells shall be borne solely by ATP.

ATP agrees that it will not assign, sublease or transfer, in whole or part, any rights acquired herein without requiring its assignees, sublessees, and transferees to expressly assume all obligations owed to Union under the terms of this Agreement, and all such pertinent terms shall be incorporated into any and all future instruments translative of title. Any assignment, sublease or transfer executed in contravention of this provision shall be null and void. Notwithstanding ATP's right to assign all or part of the interest acquired, or to be acquired hereunder to third parties, ATP shall remain fully responsible and liable for fulfillment of all the obligations and liabilities imposed herein, and for compliance with all terms and conditions established herein, whether express or implied.

\* \* \*

Union Agreement, ¶¶ 7-8. Despite assigning the operating rights to a depth of 6500 feet, Union retained ownership of the Leases themselves, and it remained the Lessee of Record. Union also retained an overriding royalty, granting it a right to receive a portion of any oil and gas (or the value thereof) that ATP subsequently might produce from the Leases.

### C. Sojitz acquired 20% of the operating rights from ATP, and agreed to assume 20% of the Decommissioning Obligations.

9. ATP subsequently assigned 20% of its operating rights to Sojitz. In exchange, Sojitz agreed (among other things) to assume 20% of the Decommissioning Obligations, including 20% of ATP's indemnity liability to Union. ATP and Sojitz agreed to the assignment pursuant to a letter agreement (the "Participation Agreement," attached as Exhibit 4) which stated that Sojitz would "*with respect to the interests it acquires*," observe and comply with all

4

covenants, terms, and provisions of the Union Agreement. [Emphasis added.] In anticipation of the formal assignment, ATP and Sojitz signed a Joint Operating Agreement (the "JOA," attached as Exhibit 5), which stated that: "A wellbore abandonment or platform removal required by a governmental authority having jurisdiction shall be accomplished by [ATP] with the costs, risks, and net proceeds, if any, *to be shared by the Parties owning the wellbore or platform in proportion to their Participating Interests therein*." Exhibit A to the JOA disclosed that ATP was obligated to indemnify Union with respect to its operations, stating:

> This . . . Agreement is subject to the Union Agreement which is incorporated herein by reference. The Union Agreement provides, among other things that…*ATP* will indemnify Union with respect to ATP's Operations.

JOA, Exhibit 5, at ¶4(e). The JOA did not state, and Sojitz did not agree, that Sojitz would be contractually responsible for more than 20% of any liability, to Union or to anyone else, for any Decommissioning Obligations.

10. The parties' mutual understanding that Sojitz had agreed to assume only 20% of the Decommissioning Obligations was finally consummated in the formal Assignment from ATP to Sojitz (the Sojitz Assignment, attached as Exhibit 6). The Assignment defined the "Assigned Premises" to include an undivided 20% of the operating rights and the associated properties. After limiting the definition of the "Assigned Premises" specifically to that 20% interest, the Assignment stated:

> *[W]ith respect to the Assigned Premises*, [Sojitz] hereby specifically assumes and undertakes the obligations, liabilities and indemnifications contained in the [Union Agreement].

\* \* \*

5

> This Assignment is made and accepted subject to all depth limitations, contracts, agreements, encumbrances and burdens . . . described in this Assignment or provided for in any instrument, contract or agreement described in Exhibit A, and *Assignee agrees to assume and be liable for its proportionate share thereof as to the Assigned Premises*.
>
> * * *
>
> *Assignee agrees to assume and be liable for its proportionate share of all obligations pertaining to the Assigned Premises, including but not limited to the obligation to bear its share of the cost, risk and expense to plug and abandon any well or wells, pipelines, flowlines, platforms or facilities pertaining to the Assigned Premises*.

Sojitz Assignment, ¶¶1, 2 and 4.

### D. Sojitz returned its 20% interest in the operating rights to ATP, which agreed to release Sojitz and re-assume its 20% share of the Decommissioning Obligations.

11. Six years later, in 2009, Sojitz assigned its 20% interest in the operating rights back to ATP. Under the terms of that assignment (the Sojitz Re-Assignment, attached as Exhibit 7), Sojitz paid ATP for Sojitz' 20% share of the Decommissioning Obligations and ATP agreed to re-assume the 20% of the Decommissioning Obligations it previously had assigned to Sojitz:

> [ATP's] execution of this assignment constitutes acceptance of all applicable terms, conditions, stipulations and restrictions pertaining to the lease described herein. Applicable terms and conditions include, but are not limited to, an obligation to conduct all operations on the leasehold in accordance with the terms and conditions of the lease, to condition all wells for proper abandonment, to restore the leased lands upon completion of any operations as described in the lease. and to furnish and maintain bond(s) pursuant to regulations at 30 CFR 256.

Sojitz Re-Assignment, ¶4. ATP further agreed "to assume and be liable for all obligations pertaining to the Assigned Interest as of and following the Effective Date." Sojitz Re-Assignment, at Exhibit A, ¶3. It also released Sojitz from any liabilities or obligations arising or

6

pertaining to its prior ownership or operations on the Leases, regardless of whether those liabilities accrued before or after the Effective Date. See Sojitz-ATP Purchase and Sale Agreement, Exhibit 8.

12. After Sojitz assigned its 20% operating rights interest back to ATP, Sojitz retained no interest in the Leases, it retained no contractual obligations or liabilities to ATP, and it retained no contractual obligations or liabilities with regard to the contract and assignment between ATP and Union.

### E. ATP went bankrupt, reneged on its agreements with Union and Sojitz, and defaulted on the Decommissioning Obligations.

13. On August 17, 2012, three years after Sojitz had relinquished its prior interest and obtained a release, ATP filed Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, *In Re ATP Oil & Gas Corporation*, Docket No. 12-36187.

14. On June 20, 2013, the Bankruptcy Court issued an order authorizing ATP to abandon and relinquish its obligations under the Leases. As a result of that order, ATP notified BSEE that it would no longer perform any required maintenance or decommissioning activities related to the Leases.

### F. The United States Ordered Union and Sojitz to perform the Decommissioning Obligations.

15. By letters dated June 20, 2014, BSEE advised Union that ATP had abandoned and/or relinquished its obligations related to the Leases and that ATP would not perform any Decommissioning Obligations. BSEE also advised Union that, as the owner of the record title interest in and to the Leases, Union was responsible for the Decommissioning

7

Obligations under 30 CFR § 250.1702. BSEE expressly ordered Union to perform the Decommission Obligations, commencing immediately. See Exhibit 9.

16. BSEE similarly advised Sojitz that, as a former owner of operating rights under the Leases, Sojitz remained responsible under federal law for the Decommissioning Obligations. Therefore, as it had with Union, BSEE also ordered Sojitz to perform the Decommissioning Obligations, commencing immediately.

**G. Union refused to comply with BSEE's order, forcing Sojitz to perform Union's Decommissioning Obligations.**

17. After receiving the letters from BSEE, Sojitz sent a letter to Union suggesting that the parties meet and coordinate their joint performance of the Decommissioning Obligations. Notwithstanding that it already had paid ATP for the 20% share of the Decommissioning Obligations it previously had agreed to pay under its agreement with ATP, Sojitz offered to bear 20% of the Decommissioning Obligations; however, Union denied that it shared responsibility for any portion of the Decommissioning Obligations, even though it admittedly owned 100% of the Record Title interest in the Leases. The Parties were not able to resolve their differences. Eventually, without waiver or prejudice to their respective positions, the Parties signed a letter agreement designating Sojitz as the decommissioning operator, and they submitted to the letter agreement to BSEE so that the operations mandated by BSEE's orders could commence.

18. After conducting the necessary analysis and review, Sojitz notified Union that it intended to begin plugging and abandonment operations. It provided a detailed description of the contemplated abandonment operations, along with cost estimates and AFE's (Authorizations for Expenditures) for the first phase of the decommissioning work. Sojitz

8

expressly informed Union that its position had not changed with regard to each entity's cost-sharing responsibilities. It informed Union that, if no agreement was reached between the parties, it would proceed with the operations while reserving, and without waiving, any and all rights it may have against Union. Nevertheless, Union still refused to honor its legal and contractual Decommissioning Obligations, forcing Sojitz—as the party who had been designated to BSEE as the decommissioning operator—to proceed alone.

19. After completing the first phase of the operations, Sojitz sent a detailed cost report to Union. By then, Sojitz had incurred decommissioning costs of $5,513,919. Sojitz indicated that Union was responsible for 80% of those costs, or $4,631,692; however, it refused to pay.

20. Later, by letter dated June 15, 2017, Sojitz notified Union of the estimated total cost of the operations and indicated that Union was responsible for 80% of that amount. The total operations were estimated to cost $10,939,203 with Union's 80% share being $8,751,362. Sojitz received no response to the letter from Union.

21. All conditions precedent have occurred or have been performed.

## CAUSE OF ACTION

### A. Declaratory Judgment

22. Sojitz reasserts paragraphs 7 through 21.

23. Sojitz seeks a declaration regarding the rights and obligations of the parties with regard to the Decommissioning Obligations on the Leases. *See* 28 U.S.C. § 2201. A justiciable controversy exists that makes this suit ripe for a declaratory judgment as Sojitz

9

seeks a determination of the liability of Union for its share of the expense of plugging, abandoning and decommissioning operations on these Leases as follows:

a. That Union, as owner of Record Title to the Leases and as a predecessor owner of 100% of the operating rights, and Sojitz, as a predecessor owner of an undivided 20% interest in the operating rights, are jointly and severally responsible to the United States for the Decommissioning Obligations under those Leases.

b. That, as between Union and Sojitz, the contracts and instruments at issue in this case place the liability for the Decommissioning Obligations entirely upon Union or, alternatively, they place 80% of the liability for the Decommissioning Obligations upon Union and 20% of the liability upon Sojitz.

24. Sojitz prays for a declaratory judgment setting out these obligations of Union.

**B. Equitable Subrogation**

25. Sojitz reasserts paragraphs 7 through 21.

26. As between Union and Sojitz, Union is primarily responsible for the Decommissioning Obligations. Union acquired the Leases from the United States, and it maintained its ownership of the Leases throughout their entire terms. Under the terms of each of its Leases, Union promised the United States that "*[w]ithin a period of 1 year after termination of this lease in whole or in part, the Union shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and Orders of the Director.*" Union breached the Leases by failing to remove all such devices, works and structures within the agreed period.

27. Sojitz no longer owned any interest in the Leases, it owed no contractual duties or obligations to Union, and its previous contractual duties and obligations to ATP had been satisfied and terminated. Nevertheless, BSEE ordered Sojitz to perform the Decommissioning Obligations because federal law authorized BSEE to enforce those

10

obligations against any or all parties who ever had owned any interest in the Leases. Sojitz performed the Decommissioning Obligations to comply with BSEE's order, not as a voluntary undertaking. Under the doctrine of equitable subrogation, Sojitz is entitled to pursue the United States' claim against Union for its breach of the Leases. Such breach caused Sojitz to incur damages exceeding $10,939,203.

## C. Contribution

28. Sojitz reasserts paragraphs 7 through 21.

29. Under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, a federal court is to apply the law of whichever state is adjacent to the relevant area of the Outer Continental Shelf. 43 U.S.C. §§ 1333(a)(1), (a)(2); *See Amoco Production Co. v. Forest Oil Corp.,* 844 F.2d 251, 253 (5th Cir.1988). The law of the adjacent state is adopted as "surrogate federal law" to the extent it does not conflict with federal law and federal maritime law does not apply of its own force. 43 U.S.C. §§ 1333(a)(1), (a)(2); *See Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990).

30. Texas is the state closest to the Leases at issue and Texas law should apply.

31. Texas recognizes that when parties are jointly and severally liable for the same obligation and the party seeking contribution has paid more than its fair share of the obligation that party is entitled to a claim for contribution from its co-debtor. *See Tomaszewicz v. Wiman*, No. 08-00-00034-CV, 2002 WL 397003 at **2, 3 (Tex. App—El Paso, no pet.)(March 14, 2002), citing RESTATEMENT (FIRST) OF RESTITUTION SECTION 82(1)(1937)(a person who has discharged more than his proportionate share of a duty owed by himself and another as to which, between the two, neither had a prior duty of

11

performance, is entitled to contribution from the other). Under Texas law, the rule in equity is that one who has been compelled to pay or satisfy the whole or to bear more than his just share of a common burden on which several persons are liable is entitled to contribution against the others to obtain from them payment for their respective shares. *McKelroy v. Hamilton*, 130 S.W.2d 1114, 1115 (Tex. App.—Waco 1939, no writ).

32. Sojitz is entitled to receive contribution from Union for the costs Sojitz incurred in performing the Decommissioning Obligations. Accordingly, Sojitz seeks to recover the sum of at least $8,751,362, being Union's 80% share of the total costs incurred by Sojitz, or such other amount to which the Court may find that Sojitz is equitably entitled.

**D. Quantum Meruit**

33. Sojitz reasserts paragraphs 7 through 21.

34. As detailed above, Sojitz provided valuable services and materials to accomplish the plugging, abandoning and decommissioning operations on the Leases.

35. These services and materials were provided for the benefit of Union.

36. Union accepted and benefitted from these services and materials provided by Sojitz.

37. Union had reasonable notice that Sojitz was performing these operations and expected compensation or reimbursement for the services and materials to the extent beyond the 20% that Sojitz offered to absorb.

38. Sojitz is entitled to recover on its claim for quantum meruit the sum of at least $8,751,362 from Union, being 80% of the total cost of $10,939,203 paid by Sojitz, or such other amount as the Court may find it is equitably entitled.

12

### E. Unjust Enrichment

39. Sojitz reasserts paragraphs 7 through 21.

40. Several courts in Texas have recognized a claim for unjust enrichment as an independent cause of action. *See Pepi Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). The Texas Supreme Court has also indicated that there is a separate cause of action for unjust enrichment. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 685 (Tex. 2000); *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 885, 891 (Tex. 1998).

41. As detailed above, Sojitz provided valuable services and materials to accomplish the plugging, abandoning and decommissioning operations on the Leases.

42. These services and materials were provided for the benefit of Union.

43. Union accepted and benefitted from these services and materials provided by Sojitz.

44. Union had reasonable notice that Sojitz was performing these operations and expected compensation or reimbursement for at least 80% of the cost of such services and materials.

45. Sojitz is entitled to recover under a theory of unjust enrichment the sum of at least $8,751,362 from Union, being 80% of the total cost of $10,939,203 paid by Sojitz, or such other amount to which the Court may find that Sojitz is equitably entitled.

### PRAYER FOR RELIEF

For the above stated reasons, SOJITZ ENERGY VENTURE, INC. prays that UNION OIL COMPANY OF CALIFORNIA be cited to appear and answer herein. Sojitz further

prays that upon final trial, it receive judgment against Union for the declaratory judgment set out above and for all damages claimed, all costs of suit, prejudgment and post judgment interest as allowed by law, such attorneys' fees as may be allowed by law, and any other relief to which Sojitz may be justly entitled.

                Respectfully submitted,

                **MUNSCH HARDT KOPF & HARR, P.C.**

                /s/ D. Mitchell McFarland
                D. Mitchell McFarland
                State Bar No.: 13597700
                Fed. Bar No. 2379
                mmcfarland@munsch.com
                700 Milam, Suite 2700
                Houston, Texas 77002
                Telephone: (713) 222-1470
                Fax:        (713) 222-1475

                ***ATTORNEY IN CHARGE FOR PLAINTIFF***
                ***SOJITZ ENERGY VENTURE, INC.***

**OF COUNSEL**

**MUNSCH HARDT KOPF & HARR, P.C.**
    Russell W. Miller
    Texas State Bar No. 14112300
    rmiller@munsch.com
    Carrie Schadle
    cschadle@munsch.com
    Texas State Bar No. 24051618
    700 Milam Street, Suite 2700
    Houston, Texas 77002
    713.222.1470 (T)
    712.222.1475 (F)