IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SOJITZ ENERGY VENTURE, INC. | § | |
| | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:17-cv-02941 |
| | § | |
| UNION OIL COMPANY OF | § | |
| CALIFORNIA | § | |
| | § | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page No.

Table of Contents...........................................................................................................i

Table of Authorities.....................................................................................................ii

| | | |
|---|---|---|
| I. | Nature and State of the Proceedings.................................................... 1 | |
| II. | Issues for the Court................................................................................ 1 | |
| III. | Summary of the Argument..................................................................... 2 | |
| IV. | Undisputed Facts................................................................................... 3 | |

    A.    Union acquired oil and gas leases from the U.S. in 1999 and assigned the rights to ATP in 2000 .......................................................................... 3

    B.    ATP assigned a 20% interest of its rights to Sojitz in 2003......................... 4

    C.    Sojitz reassigned its 20% interest back to ATP in 2009 ............................... 4

    D.    ATP filed for bankruptcy in 2012 .................................................................. 5

    E.    BSEE ordered Union and Sojitz to perform decommissioning of all facilities related to the leases ....................................................................... 5

    F.    Discussions with Union about Decommissioning – Union's estimate for the necessary work ........................................................................................ 6

    G.    Union refused to comply with BSEE's order, forcing Sojitz to perform Union's decommissioning obligations .......................................................... 7

V.    Argument and Authorities ...................................................................... 8

    A.    General obligations of lessees on federal leases ......................................... 8

    B.    Union received the benefit of its bargain with ATP – Sojitz is entitled to equitable subrogation for 100% of what it paid ........................................ 10

    C.    Sojitz is entitled to contribution from Union ............................................. 13

    D.    Quantum meruit and unjust enrichment ...................................................... 17

    E.    Union's affirmative defenses and counterclaims related to the ATP/Sojitz transaction fail as a matter of law............................................................... 18

        1.    The plain language of the ATP/Sojitz agreement and the assignment to Sojitz precludes Union' counterclaims ............................................... 18

        2.    Union is not a third-party beneficiary of the ATP/Sojitz agreement.. 20

        3.    The indemnity obligation in the Union/ATP agreement is not a covenant running with the land........................................................... 22

VI.    Conclusion ............................................................................................ 23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amoco Production Co. v. Forest Oil Corp.*,
   844 F.2d 251 (5th Cir.1988) ..................................................................... 14

*In re El Paso Refinery, LP*,
   302 F.3d 343 (5th Cir.2002) ............................................................... 22, 23

*First Bank v. Brumitt*,
   519 S.W.3d 95 (Tex. 2017) ...................................................................... 21

*Fortune Prod. Co. v. Conoco, Inc.*,
   52 S.W.3d 671 (Tex. 2000) ...................................................................... 17

*Frymire Engineering Co., Inc. v. Jomar International, Ltd.*,
   259 S.W.3d 140 (Tex. 2008) .................................................................... 12

*GOM Shelf, LLC v. Sun Operating Limited Partnership*,
   No. 4:06-cv-3444, 2008 WL 901482 (S.D. Tex March 31, 2008) ................. 14, 15, 16

*HECI Expl. Co. v. Neel*,
   982 S.W.2d 881 (Tex. 1998) .................................................................... 17

*International Interests, LP v. Mt. Hawley Ins. Co.*,
   No. H-11-0580, 2012 WL 3776483 (S.D. Tex. Aug. 29, 2012) ........................... 22, 23

*McKelroy v. Hamilton*,
   130 S.W.2d 1114 (Tex. App.—Waco 1939, no writ) ................................... 14

*Mid–Continent Ins. Co. v. Liberty Mut. Ins. Co.*,
   236 S.W.3d 765 (Tex. 2007) .................................................................... 12

*Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*,
   236 S.W.3d 765,772 (Tex. 2007) ............................................................. 14

*Miller v. Miles*,
   400 S.W.2d 4 (Tex. App.—Waco 1966 writ ref'd. n.r.e.) ........................... 14

*Murray v. The Cadle Company*,
   257 S.W.3d 291 (Tex. App.—Dallas 2008 pet. denied) ............................... 12

*Mut. Life Ins. Co. of New York v. Daddy$ Money, Inc.*,
   646 S.W.2d 255 (Tex. App.—Dallas 1982, writ ref'd n.r.e.) ................................ 21, 22

*Pepi Corp. v. Galliford*,
   254 S.W.3d 457 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ................... 17, 18

*Seagull Energy E & P, Inc. v. Eland Energy, Inc.*,
   207 S.W.3d 342 (Tex. 2006) ................................................................................ 10, 16

*Tomaszewicz v. Wiman*,
   No. 08-00-00034-CV, 2002 WL 397003 (Tex. App—El Paso, no pet.)
   (March 14, 2002) .................................................................................................. 14

*In Re Tri-Union Development Corp.*,
   314 B.R. 611 (Bankr. S.D. Tex 2004) ................................................................... 13

*Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc.*,
   787 S.W.2d 942 (Tex. 1990) ................................................................................ 17

## Statutes

43 U.S.C. §§ 1333(a)(1), (a)(2) ...................................................................................... 14

Under the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.* ....................... 14

4829-2896-9329v.1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SOJITZ ENERGY VENTURE, INC. | § | |
| | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:17-cv-02941 |
| | § | |
| UNION OIL COMPANY OF | § | |
| CALIFORNIA | § | |
| | § | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff, SOJITZ ENERGY VENTURE, INC. ("Sojitz") moves for summary judgment on its claims against UNION OIL COMPANY OF CALIFORNIA ("Union"), as follows:

### I.    NATURE AND STATE OF THE PROCEEDINGS

Sojitz has made claims against Union for reimbursement of amounts Sojitz paid for the decommissioning of wells and other facilities on federal offshore leases for which Union was responsible in whole or in part.  The parties have substantially completed written discovery; no depositions have yet been taken.  The parties mediated the case with Retired District Judge Tad Halbach on July 18, 2018 but were unable to reach a settlement.  The Court's docket control order has set docket call for February 21, 2019.

### II.    ISSUES FOR THE COURT

Sojitz asks the Court to rule that as a matter of law Union must reimburse Sojitz for the full cost decommissioning of offshore oil wells and facilities on which it was the

1

Lessee of Record under the doctrine of equitable subrogation or, alternatively, 80% of such cost under a contribution theory, quantum meruit or unjust enrichment.  Sojitz also asks the Court to hold that the counterclaims by Union related to alleged contractual and indemnity obligations fail as a matter of law.

### III.   SUMMARY OF THE ARGUMENT

Union was the lessee of record on two federal offshore leases and assigned operating rights to certain depths on those leases to ATP Oil & Gas Corporation.  Sojitz acquired 20% of ATP's operating rights in 2003 but assigned them back to ATP in 2009.  In 2012, ATP filed for bankruptcy and Union was obligated under federal regulations to plug and abandon all wells and decommission all facilities and was ordered to do so by the regulators.  Sojitz, as a former holder of rights, was ordered to do the same.  Union would not agree to participate and Sojitz undertook and performed all the decommissioning obligations at net cost of $8,751,362.  Sojitz is entitled to recover that amount from Union under the doctrine of equitable subrogation.  In the alternative, Sojitz is entitled to 80% of those costs under theories of either contribution, quantum meruit and unjust enrichment.

Union's affirmative defenses and counterclaims fail as a matter of law.  Under the plain language of the ATP/Sojitz assignment Sojitz acquired only 20% of ATP's interest, and therefore agreed to assume only 20% of ATP's obligations to Union.  Sojitz fulfilled any obligations it had to Union during the life of the assignment, and those obligations were extinguished when Sojitz reassigned the 20% interest back to ATP three years

2

before it filed for bankruptcy.  Sojitz owes no contractual obligation for indemnity to Union.

## IV.   UNDISPUTED FACTS

### A.   Union acquired oil and gas leases from the U.S. in 1999 and assigned the rights to ATP in 2000.

1.      In 1999, Union acquired two oil and gas leases issued by the United States covering Block 142, Garden Banks, OCS Official Protraction Diagram, NG 15-2 142, (OCS-G 21378) ("GB 142") and Block 186, Garden Banks, OCS Official Protraction Diagram, NG 15-2 (OCS-G 21381) ("GB 186") in the Gulf of Mexico off the Texas coast (the "Leases").  Second Amended Answer at ¶7, Doc 18 (herein "Answer").[1]  Union was Lessee of record and record title holder under those Leases at all pertinent times.  *Id.*; Complaint Exhibits 1 and 2;  Affidavit of Alan F. Rimel, Exhibit A at ¶2.

2.      In 2000, Union assigned operating rights[2] under the Leases for certain depths to ATP Oil & Gas Corporation ("ATP").  Answer at ¶ 8.  Union retained record title and an overriding royalty.  *Id.*  The Union/ATP Agreement is attached to the Complaint as Ex. 3.  Rimel at  ¶3.

3.      Under the Union/ATP Agreement, ATP agreed to indemnify and hold Union harmless from any risk or liability associated with ATP's operations on the Leases, including the cost of plugging or abandoning wells.  Answer at ¶ 8; Union Agreement at ¶ 7.  In addition, ATP agreed that if it assigned any of its rights to a third party that it

---

[1]In this motion, Sojitz will reference the discussion and admissions by Union in its Answer and those allegations in the Complaint that Union simply admitted.

[2]An "operating right" is an interest created out of a lease authorizing the holder of that right to enter upon the leased lands to conduct drilling and related operations.  43 C.F.R. § 3100.0-5(d).   It is also defined as any interest held in a lease with the right to explore for, develop, and produce leased substances.  30 C.F.R. § 550.105

would require the third party to assume all obligations to Union under the Union/ATP Agreement. *Id.* at ¶ 8.

**B.      ATP assigned a 20% interest of its rights to Sojitz in 2003.**

4.      In 2003, ATP assigned 20% of the operating rights it held to NI Energy Venture, a predecessor of Sojitz.  Answer at ¶ 9.  The ATP/NI Energy agreement is attached as Exhibit 4 to the Complaint.  Rimel at ¶ 4.  Under the agreement, Sojitz agreed, with respect to the interest it acquired, to observe and comply with the terms of the Union/ATP Agreement.  Answer at ¶ 9; Rimel at ¶ 4; Complaint Ex. 4 at ¶ 6.  The assignment from ATP to Sojitz states explicitly that Sojitz, as assignee, agrees to assume and be liable to ATP for its proportionate share of all obligations pertaining to the operating rights assigned.  Rimel at ¶ 4; Complaint Ex. 6, ATP Assignments at ¶¶'s 1, 2, 4.  The assignment defines the 20% Assigned Operating Rights as the "Assigned Premises."  *Id.*  In the referenced paragraphs of the assignment, Sojitz agrees that "with respect to the Assigned Premises, [Sojitz] … assumes and undertakes the obligations … contained in the [Union/ATP Agreement]."  *Id.*

5.      ATP and Sojitz entered into an Operating Agreement that allowed a Withdrawing Party to pay its share of the cost to plug and abandon all wells and facilities and be relieved of any further obligation.  Rimel at ¶ 5, Complaint Ex. 5, Operating Agreement at Art. 15.1.

**C.      Sojitz reassigned its 20% interest back to ATP in 2009.**

6.      After six years, Sojitz reassigned its 20% interest back to ATP in September 2009.  Answer at ¶ 11.  Under the terms of the Purchase and Sale Agreement,

Sojitz paid the sum of $4,750,000 to ATP, which was deemed to be the negative value of GB 142 and 186 and the other properties that were conveyed to ATP at that time.  Rimel at ¶ 7, Complaint Ex. 8, Sojitz/ATP PSA at Art. 2.2.

7.      In exchange, ATP agreed to assume sole responsibility for all costs associated with plugging and abandonment of all wells and facilities and agreed to indemnify Sojitz for any such costs.  Rimel at ¶ 8; Complaint Ex. 8, Sojitz/ATP  at Art. 11.3(a), (b); Complaint Ex. 8 at 21.  Again, in the assignment by Sojitz to ATP, ATP agreed to assume and be liable for all obligations pertaining to the assigned interests after the effective date.  Complaint Ex. 7, Sojitz Assignment at Part B ¶ 4 and Exhibit A, ¶ 3.

8.      Thus, as of September 2009, ATP had 100% of the original operating rights assigned to it by Union.  As of that time, ATP and Union were in the same position they were in before Sojitz purchased a 20% interest in 2003.

### D.      ATP filed for bankruptcy in 2012.

9.      On August 7, 2012, ATP filed a chapter 11 bankruptcy proceeding in the Southern District of Texas, Houston Division.  Answer at ¶ 13.  On June 20, 2013, the Bankruptcy Court issued an order authorizing ATP to abandon and relinquish its obligations under the leases covering GB 142 and 186.  Answer at ¶ 14.  As a result of that order, ATP notified the Bureau of Safety and Environmental Enforcement ("BSEE") that it would no longer perform any required maintenance or decommissioning activities related to the leases.  *Id.*

### E.      BSEE ordered Union and Sojitz to perform decommissioning of all facilities related to the leases.

10.     On June 20, 2014, BSEE advised Union that as the owner of the record title interest in the Leases, Union, was responsible for the decommissioning all wells and facilities under 30 CFR § 250.1702.  Answer at ¶ 15; Complaint Ex. 9.  BSEE expressly ordered Union to perform the decommissioning obligations, commencing immediately. *Id.*

11.     BSEE similarly advised Sojitz that, as a former owner of operating rights under the Leases, Sojitz remained responsible under federal law for the decommissioning obligations.  Answer at ¶ 16.  Therefore, BSEE also ordered Sojitz to perform the decommissioning obligations, commencing immediately.  *Id.*

### F.     Discussions with Union about Decommissioning – Union's estimate for the necessary work.

12.     After receiving the letters from BSEE, Sojitz met with Union to coordinate the performance of the decommissioning obligations.  Answer at ¶17.  Notwithstanding that it already had paid ATP for its 20% share of the decommissioning costs, Sojitz offered to bear 20% of the decommissioning costs with Union.  *Id.*

13.     It was during these discussions that Union forwarded its cost estimate for the work necessary to decommission all facilities.  Rimel at ¶ 11.  Union estimated it would cost $11.2 million for well abandonment and $21 million for structure decommissioning for a total of **<u>$32.2 million</u>**.  *Id.*

14.     Sojitz ultimately performed all the operations necessary for abandonment and decommissioning for a little over $10 million – well less than a third of Union's projections.

### G.     Union refused to comply with BSEE's order, forcing Sojitz to perform Union's decommissioning obligations

15.     Union denied that it shared responsibility for any portion of the decommissioning obligations, even though it admittedly owned 100% of the Record Title interest in the Leases at that time.  The parties were not able to resolve their differences. Eventually, without waiver or prejudice to their respective positions, the parties signed a letter agreement designating Sojitz as the decommissioning operator which was submitted to BSEE so that the decommissioning operations could commence.  Answer at ¶ 17.

16.     Throughout the process, Sojitz notified Union of its intended operations.  It provided a detailed description of the contemplated abandonment operations, along with cost estimates and AFE's (Authorizations for Expenditures) for the decommissioning work.

17.     Sojitz expressly informed Union that its position had not changed with regard to each entity's cost-sharing responsibilities.  Answer at ¶ 18.  It informed Union that, if no agreement was reached between the parties, it would proceed with the operations while reserving, and without waiving, any and all rights it may have against Union.  *Id.*  Union refused to take in part in the process forcing Sojitz—as the party designated to BSEE as the decommissioning operator—to proceed alone.

18.     Later, by letter dated June 15, 2017, Sojitz notified Union of the estimated total cost of the operations and indicated that Union was responsible for 80% of that amount.  Rimel at ¶ 15.  The total operations were estimated to cost $10,939,203 with

Union's 80% share being $8,751,362.  Sojitz received no response to the letter.  *Id.*

19.    After operations were complete, the total cost incurred by Sojitz was $10,016,698.35.  Stipulation, Doc. 14.  The Parties have stipulated that these costs were reasonable and necessary to accomplish the decommissioning obligations.  *Id.*  Recently, this amount was reduced by funds paid to Sojitz from a trust fund established in the ATP bankruptcy to handle decommissioning costs for "orphan wells."  The net amount paid by Sojitz for decommissioning was **$8,403,909.38** which the parties have stipulated were reasonable and necessary to accomplish the decommissioning obligations.  *Id.*

## V.    ARGUMENT AND AUTHORITIES

### A.    General obligations of lessees on federal leases.

Under the terms of each of the Leases, Union promised the United States that:

> Within a period of 1 year after termination of this lease in whole or in part, the Lessee [Union] shall remove all devices, works, and structures from the premises no longer subject to the lease in accordance with applicable regulations and Orders of the Director.

Complaint Ex.s 1, 2; Leases at Section 22.  In addition, Union accrued decommissioning obligations the moment it executed the leases in question.  The regulations provide:

> (a)    Lessees and owners of operating rights are jointly and severally responsible for meeting decommissioning obligations for facilities on leases, including the obligations related to lease-term pipelines, as the obligations accrue and until each obligation is met.

30 C.F.R. § 250.1701 (a).  Further the regulations provide:

> You accrue decommissioning obligations when you ... (d) [a]re or become a lessee or the owner of operating rights of a lease on which there is a well that has not been permanently plugged according to this subpart, a platform, a lease term pipeline, or other facility, or an obstruction.

30 C.F.R. § 250.1702.

8

At the time that Union and Sojitz received notice from BSEE in December 2014, the regulations provided as follows with regard to liability of the assignor of a lease or undivided interest in a lease:

> (d)   You, as assignor, are liable for all obligations that accrue under your lease before the date that the Regional Director approves your request for assignment of the record title in the lease. The Regional Director's approval of the assignment does not relieve you of accrued lease obligations that your assignee, or a subsequent assignee, fails to perform.
>
> …
>
> (f)   If your assignee, or a subsequent assignee, fails to perform any obligation under the lease or the regulations in this chapter, the Regional Director may require you to bring the lease into compliance to the extent that the obligation accrued before the Regional Director approved the assignment of your interest in the lease.

30 C.F.R. § 256.62 (2011).

Since July 2016 the regulations provide as follows with regard to operating rights assignments such as the assignment from Union to ATP:

> (d)   Every current and prior record title owner is jointly and severally liable, along with all other record title owners and all prior and current operating rights owners, for compliance with all non-monetary terms and conditions of the lease and all regulations issued under OCSLA, as well as for fulfilling all non-monetary obligations, **including decommissioning obligations**, which accrue while it holds record title interest.
>
> 30 C.F.R. § 556.604 (2016) (emphasis added).[3]
>
> (a)   A record title holder who subleases operating rights remains liable for all obligations of the lease, including those obligations accruing after BOEM's approval of the sublease, subject to § 556.604(e) and (f).
>
> 30 C.F.R. § 556.711 (2016).

---

[3] "Non-monetary obligations are differentiated in the regulations from "monetary obligations" such as royalty payments.

Thus, Union remained liable for all decommissioning obligations after its assignments to ATP.

**B.    Union received the benefit of its bargain with ATP – Sojitz is entitled to equitable subrogation for 100% of what it paid.**

Union cannot (and did not) escape its liability for decommissioning by assigning the leases to ATP.  Generally speaking, a party cannot escape its obligations under a contract merely by assigning the contract to a third party.  *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 346-47 (Tex. 2006).  Thus, as a general rule, a party who assigns its contractual rights and duties to a third party remains liable unless expressly or impliedly released by the other party to the contract.  *Id.*

Union did not receive a release from its obligations from the U.S. when it assigned operating rights related to the leases to ATP.  Sojitz reassigned its interest to ATP, paid for its share of decommissioning costs, and obtained a release.  At the time BSEE demanded that the properties be decommissioned, Sojitz had no ownership interest.  Thus, when BSEE sent its notice in December 2014, Union should have assumed 100% of the obligation to decommission the two leases.

Union will argue that Sojitz assumed ATP's obligation to indemnify and hold Union harmless from any risk or liability associated with ATP's operations on the leases, including the cost of plugging or abandoning wells.[4]  It was certainly true that Sojitz took on 20% of that responsibility under its agreement with ATP.  During the time that Sojitz was a 20% owner (2003 – 2009), it paid its share of costs and Union paid nothing.  Rimel

---

[4]Union's counterclaims and defenses are discussed below.

at ¶ 6.  Thus, to the extent that Sojitz owed indemnity to Union for that period, all of its obligations were performed.

But, Sojitz reassigned its 20% back to ATP and paid for its share of decommissioning costs.  ATP agreed to accept sole responsibility for all costs of plugging and abandoning the wells and decommissioning of all platforms and other equipment.  ATP released Sojitz from all such liability and agreed to indemnify and hold Sojitz harmless from any claims related to decommissioning costs.  Complaint Ex. 8 at Article 11.3(b).  Sojitz was out of the picture and Union and ATP were where they started in 2000.  ATP did not file for bankruptcy until 2012 three years after the reassignment.

When ATP filed for bankruptcy protection in 2012, Union was the record title holder of the Leases.  As a result, Union was responsible under the terms of the Leases to perform all decommissioning obligations.  Leases at ¶ 22.  In addition, under the regulations, Union was liable for all obligations under the lease and its assignment to ATP did not relieve it of such obligations.  30 C.F.R. § 256.62(d).  And, if a subsequent assignee (like ATP), failed to perform any obligation under the lease, Union was required to bring the lease into compliance.  30 C.F.R. § 256.62(f) and 30 C.F.R. § 556.711.

At the time of the ATP bankruptcy, Sojitz no longer owned any interest in the Leases, it owed no contractual duties or obligations to Union, and its previous contractual duties and obligations to ATP had been satisfied, terminated, and released by ATP.  However, BSEE ordered Sojitz to perform the decommissioning obligations because, as noted above, it at one time owned operating rights.  Union failed and refused to perform its obligations.  Sojitz performed the decommissioning obligations to comply with

11

BSEE's order, not as a voluntary undertaking.   Under the doctrine of equitable subrogation, Sojitz is entitled to pursue the United States' claim against Union for its breach of the leases and recover 100% of the cost it incurred to complete the decommissioning of GB 142 and 186.

Equitable subrogation applies "in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter." *Mid–Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 774 (Tex. 2007).   As noted by the Texas Supreme Court in *Frymire Engineering Co., Inc. v. Jomar International, Ltd.,* 259 S.W.3d 140, 142 (Tex. 2008):

> The doctrine of equitable subrogation allows a party who would otherwise lack standing to step into the shoes of and pursue the claims belonging to a party with standing.   Texas courts interpret this doctrine liberally.   Although the doctrine most often arises in the insurance context, equitable subrogation applies "in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter." Thus, a party seeking equitable subrogation must show it involuntarily paid a debt primarily owed by another in a situation that favors equitable relief.

*Id*. (footnotes omitted); *Mid–Continent Ins. Co.,* 236 S.W.3d at 774.   The general purpose of equitable subrogation is to prevent unjust enrichment of the debtor.   *Murray v. The Cadle Company*, 257 S.W.3d 291, 299 (Tex. App.—Dallas 2008 pet. denied) (citing *First Nat'l Bank v. O'Dell,* 856 S.W.2d 410, 415 (Tex. 1993)).

There are two key elements to equitable subrogation: (1) the person whose debt was paid was primarily liable on the debt, and (2) the claimant paid the debt involuntarily.   *Murray*, 257 S.W.3d at 299 (citing *Harrison v. First Nat'l Bank,* 238 S.W. 209, 210 (Tex. Comm'n App.—1922, judgm't adopted)).   Here, as noted above, under

the Leases and the regulations Union was primarily liable as the record title holder of such leases at the time of the ATP bankruptcy.  Sojitz did not perform all of the work as a volunteer because BSEE ordered that the work be done.  Union refused to pay.

*In Re Tri-Union Development Corp*., 314 B.R. 611 (Bankr. S.D. Tex 2004), supports Sojitz's claim.  In that case, Tri-Union operated offshore oil and gas blocks and related property.  As a part of its plan confirmation it was required to post surety bonds to assure the satisfaction of its plug and abandon obligations to the Minerals Management Service (predecessor to BSEE).  It obtained those bonds from Greenwich Insurance.  Greenwich and all of Tri-Union's co-lessees filed proofs of claim for contingent decommissioning costs.   The court had to resolve the issue that the costs of decommissioning might be paid more than once under the competing claims.  But the parties agreed and the court held that, to the extent that Greenwich or the co-lessees paid the decommissioning obligations of Tri-Union they would be subrogated to the claim of the MMS along with its priority.  *Id.* at 622.  Sojitz is in the same position here.

Sojitz involuntarily paid a debt that should have been paid by Union.  It is entitled to recover all those amounts it paid to decommission the facilities ($8,403,909.38, as stipulated) from Union under the doctrine of equitable subrogation.

### C. Sojitz is entitled to contribution from Union.

In the alternative, Sojitz is entitled to recover 80% of the amounts it paid for Decommissioning Operations under the doctrine of contribution.  Under the regulations all lessees and owners of operating rights are jointly and severally responsible for meeting decommissioning obligations for facilities on leases.  30 C.F.R. § 556.604; *see*

13

*GOM Shelf, LLC v. Sun Operating Limited Partnership*, No. 4:06-cv-3444, 2008 WL 901482 at *7 (S.D. Tex March 31, 2008).

Under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.,* a federal court is to apply the law of whichever state is adjacent to the relevant area of the Outer Continental Shelf. 43 U.S.C. §§ 1333(a)(1), (a)(2); *See Amoco Production Co. v. Forest Oil Corp.,* 844 F.2d 251, 253 (5th Cir.1988).  Here, that is Texas.

Texas recognizes that when parties are jointly and severally liable for the same obligation and the party seeking contribution has paid more than its fair share of the obligation, that party is entitled to a claim for contribution from its co-debtor.  *See Tomaszewicz v. Wiman*, No. 08-00-00034-CV, 2002 WL 397003 at **2, 3 (Tex. App—El Paso, no pet.) (March 14, 2002) (citing Restatement (First) of Restitution Section 82(1) (1937) (a person who has discharged more than his proportionate share of a duty owed by himself and another as to which, between the two, neither had a prior duty of performance, is entitled to contribution from the other)).[5]  Under Texas law, the rule in equity is that one who has been compelled to pay or satisfy the whole or to bear more than his just share of a common burden on which several persons are liable is entitled to contribution against the others to obtain from them payment for their respective shares. *McKelroy v. Hamilton*, 130 S.W.2d 1114, 1115 (Tex. App.—Waco 1939, no writ); *Miller v. Miles,* 400 S.W.2d 4, 7 (Tex. App.—Waco 1966 writ ref'd. n.r.e.); *see Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.,* 236 S.W.3d 765,772 (Tex. 2007).

---

[5]*See also*, Restatement (Third) of Restitution and Unjust Enrichment § 23 (2011).

The case of *GOM Shelf, LLC v. Sun Operating Limited Partnership* is right on point.  There, four companies originally acquired a federal lease in Block A-16 in the Gulf of Mexico in equal shares of 25%.  Eventually Texaco acquired 100% of the interest in the lease which it conveyed 50% to Occidental ("Oxy") and 50% to Sun Operating Limited Partnership.  In the assignments, Oxy and Sun expressly agreed to assume liability for Texaco's obligation to plug and abandon any wells on a pro rata basis.  Sun later conveyed its 50% interest to Trade & Development Corp ("T&D").  T&D assigned 12.5% to Online Resources and 37.5% to Cronus Offshore, Inc.  Online Resources then assigned its 12.5% interest to Cronus.  Oxy assigned its 50% interest to GOM Shelf, LLC.

As of July 2000, GOM had 50% and Cronus had 50%.  Cronus filed for Chapter 7 bankruptcy and GOM paid 100% of the decommissioning costs from 2002 to 2006.  GOM filed suit against Sun and Online Resources to collect 50% of the costs paid in decommissioning based on their joint and several liability under the MMS regulations.  GOM claimed that those defendants were liable based on equitable subrogation, restitution, and/or unjust enrichment.[6]

The case turned on whether the parties to the Joint Operating Agreement ("JOA") had expressly agreed to the consequences that should follow an assignment of an interest in the block.  The court noted that the provisions of the JOA required that assignors were liable for liabilities and responsibilities that accrued before they assigned their interest. *Id*. at *10.  The court noted that the regulation cited above, 30 C.F.R. § 250.1702(d),

---

[6]*See* Case No. 4:06-cv-0344, Document 22, Plaintiff's Amended Complaint.

states that the decommissioning obligations accrue when you "are or become a lessee or the owner of operating rights of a lease…"  As a result, the defendants' plugging and abandoning liabilities and responsibilities accrued before they assigned their interests in Block A-16.  The assignment did not relieve them of liability.  *Id.*  The court noted that the language of the JOA in GOM was similar to the JOA interpreted by the Texas Supreme Court in *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, noted above.  Thus, Judge Melinda Harmon held in *GOM Shelf* that the JOA did not expressly release Sun and Online from their obligations and both companies had a continuing obligations to pay their share of plugging and abandoning costs.  *Id.* at *11.

Here, Sojitz is in the same position as GOM Shelf.  Sojitz only owned 20% of the operating rights from the surface to a depth of 6,500 feet.  Sojitz has paid 100% of the decommissioning costs.  Union, as holder of the record title to the Leases at all times, was jointly and severally liable for all decommissioning obligations.  At the time of ATP's bankruptcy, Union was record title holder and obligated under the terms of the Leases "to remove all devices, works, and structures from the premises …"  Complaint Ex.s 1, 2; Leases at Section 22.  Thus, at that time, Union had the obligation to perform the decommissioning obligations for at least 80% of those costs.

Sojitz is entitled to receive contribution from Union for the costs Sojitz incurred in performing the decommissioning obligations.  Accordingly, Sojitz seeks to recover the sum of **$6,723,127.50**, being Union's 80% share of the net total costs incurred by Sojitz.

**D.      Quantum meruit and unjust enrichment.**

Sojitz provided valuable services and materials to accomplish the plugging, abandoning and decommissioning operations on the leases.  Rimel at ¶ 17.  These services and materials were provided for the benefit of Union which accepted and benefitted from the services and materials provided by Sojitz.  *Id.*  Union was put on notice that Sojitz was performing these operations and expected compensation or reimbursement for the services and materials to the extent beyond the 20% that Sojitz had offered to absorb. *Id.*

Several courts in Texas have recognized a claim for unjust enrichment as an independent cause of action.  *See Pepi Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).  The Texas Supreme Court has also indicated that there is a separate cause of action for unjust enrichment.  *See Fortune Prod. Co. v. Conoco, Inc*., 52 S.W.3d 671, 685 (Tex. 2000); *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998).

To recover in quantum meruit, the plaintiff must prove (1) that valuable services were rendered or materials were furnished, (2) for the person sought to be charged, (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him, (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services, was expecting to be paid by the person sought to be charged.  *Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc*., 787 S.W.2d 942, 944 (Tex. 1990); *Pepi Corp*. 254 S.W.3d at 460.   Here, Sojitz has established those facts.

Sojitz is entitled to recover on its claim for quantum meruit or unjust enrichment the sum of **$6,723,127.50**, being Union's 80% share of the net total costs incurred by Sojitz.

### E. Union's affirmative defenses and counterclaims related to the ATP/Sojitz transaction fail as a matter of law

Union contends that Sojitz assumed 100% of ATP's agreement to indemnify Union when it acquired its interest in 2003.   In its Second Amended Answer and Counterclaims (Doc 18) Union alleges that Sojitz's claims are barred because of its agreements with ATP and because of the indemnity obligations contained in the ATP/Union Agreement.  Doc 18 at 12-13.  It also contends that the obligations set out in those paragraphs are "covenants running with the land."  *Id*.  Union's defenses are meritless.

Likewise, Union's counterclaim for declaratory judgment and for breach of contract fail as a matter of law for the same reason.

### 1. The plain language of the ATP/Sojitz agreement and the assignment to Sojitz precludes Union' counterclaims.

Under the agreement between ATP and Sojitz, Sojitz agreed to acquire a 20% working interest in the Union Agreement.  Complaint Ex. 4 at ¶6.  Further, with respect to the interest it acquired and only with respect to that interest, it agreed to observe and comply with the terms of the Union/ATP Agreement.  *Id*.  Sojitz did not agree to acquire 100% of the ATP interest and it did not agree to fulfill 100% of the obligations of ATP under that agreement.

4829-2896-9329v.1

The limitation on the Sojitz obligations are also explicitly set for out in the assignment of operating rights from ATP to Sojitz.  On page 2 of the assignment from ATP to Sojitz the parties define the 20% Assigned Operating Rights as the "Assigned Premises."  Rimel at ¶ 4; Complaint Ex. 6, ATP Assignments at 2.  In the assignment, Sojitz agrees that "with respect to the Assigned Premises, [Sojitz] … assumes and undertakes the obligations, liabilities and indemnifications contained in the [Union/ATP Agreement]."  *Id.*, ATP Assignment at ¶¶'s 1, 2.  In paragraph 4 of the assignment Sojitz, as Assignee, agrees "to assume and be liable for its proportionate share of all obligations pertaining to the Assigned Premises, including but not limited to the obligation to bear its share of the cost, risk, and expense to plug and abandon any well or wells…"  Rimel at ¶ 4; Complaint Ex. 6, ATP Assignments at ¶ 4.  *Id.*

It is undisputed that Sojitz performed this obligation.  During the time that Sojitz was a 20% owner (2003 – 2009), it paid its share of costs and Union paid nothing.  Rimel at ¶ 6.  Union will point to language in the assignment of operating rights that states that if there is a conflict between the assignment from ATP to Sojitz and the terms and provisions of the Union/ATP, then the terms of the ATP/Union Agreement controls.  Complaint Ex. 6, ATP Assignments at ¶ 1.  There is no conflict.  As to the "Assigned Premises," being the 20% interest in the operating rights assigned to Sojitz, it assumed its liability for the obligations under that agreement and it is undisputed that, during the time Sojitz owned its interest, those obligations were performed.

Union ignores the most important fact: Sojitz reassigned its 20% back to ATP and paid for its share of decommissioning costs to ATP.  ATP agreed to accept sole

19

responsibility for all costs of plugging and abandoning the wells and decommissioning of all platforms and other equipment.  Complaint Ex. 8 at Article 11.3(a).  ATP released Sojitz from all such liability and agreed to indemnify and hold Sojitz harmless from any claims related to decommissioning costs.  Complaint Ex. 8 at Article 11.3(b).

Under the Purchase and Sale Agreement, ATP assumed sole responsibility and agreed to pay all costs with regard to plugging and abandonment of all wells and the abandonment and disposal of all platforms.  It specifically released Sojitz and agreed to protect, defend and indemnify Sojitz on any claim related to these costs.  *Id*. at Article 11.3(b).  Sojitz paid ATP for the negative value of all the properties assigned to ATP by that agreement in 2009.  *Id*. at Article 2.2.

Union authorized ATP to assign, sublease, or transfer the operating rights in the Union/ATP Agreement without consent with the proviso that any assignees assume the obligations owed to Union under the Union/ATP Agreement.  This same authority authorizes ATP to release those obligations upon reassignment to ATP.  Union is bound by the releases and agreements entered into by ATP in the Purchase and Sale Agreement in 2009 with Sojitz cited above and in the assignment by Sojitz to ATP in 2009.  *See* Complaint Ex. 8 at Exhibit F, Assignment at ¶ 2.3.

Based on the plain language in the agreements, Union's counterclaims for declaratory judgment and breach of contract fail as a matter of law.

### 2.     Union is not a third-party beneficiary of the ATP/Sojitz agreement.

20

To determine whether the contracting parties intended to directly benefit a third party and entered into the contract for that purpose, courts must look solely to the contract's language, construed as a whole. *First Bank v. Brumitt,* 519 S.W.3d 95, 102 (Tex. 2017) (citing *Southland Royalty Co. v. Pan Am. Petroleum Corp.*, 378 S.W.2d 50, 53 (Tex. 1964)).  The contract must include "a clear and unequivocal expression of the contracting parties' intent to directly benefit a third party," and any implied intent to create a third-party beneficiary is insufficient.  *Id.*  The court must begin with the presumption that the parties contracted solely "for themselves," and only a clear expression of the intent to create a third-party beneficiary can overcome that presumption.  *Id*.  If the contract's language leaves any doubt about the parties' intent, those "doubts must be resolved against conferring third-party beneficiary status." *Id*.

There is nothing in the language of the Sojitz acquisition from ATP that indicates it was intended that Union be a third-party beneficiary.  It is not disputed that Sojitz agreed to comply with the obligations under the Union/ATP Agreement as to its 20% interest.  That benefitted ATP, not Union.

In any event, Sojitz gave back it 20% to ATP and received a release.  If Union had any arguable status as a third-party beneficiary, that ended in 2009.  *See Mut. Life Ins. Co. of New York v. Daddy$ Money, Inc.,* 646 S.W.2d 255, 259 (Tex. App.—Dallas 1982, writ ref'd n.r.e.).  In *Daddy$ Money*, MONY claimed that certain premium finance agreements constituted a binding election to have the cash surrender values of the policies apply to purchase reduced paid-up participating life insurance.  But, in that case, the premium finance notes had been released and were no longer in force and effect.  *Id*.

21

Since the premium notes had been released, Key Resources, Inc., the payee of the note, had no rights against the insured and consequently, MONY as third party beneficiary could have no greater rights than the payee.  *Id.*  The same is true here.  To the extent Sojitz assumed any liability to Union, that was released and extinguished in 2009.

### 3.     The indemnity obligation in the Union/ATP agreement is not a covenant running with the land.

There is no statement of intent by the parties in the Union/ATP Agreement that they intended any agreement or covenant to "run with the land."  To the contrary, the agreement by ATP to indemnify and hold Union harmless from all risk and cost associated with ATP's operation is personal to Union.  That is not a covenant running with the land as a matter of law.  *See In re El Paso Refinery, LP,* 302 F.3d 343, 356-57 (5th Cir.2002); *International Interests, LP v. Mt. Hawley Ins. Co.*, No. H-11-0580, 2012 WL 3776483 at *4 (S.D. Tex. Aug. 29, 2012).

In *El Paso Refinery*, the seller (TRMI Holdings) of a refinery included a covenant in the deed preventing any subsequent owner from seeking contribution from the seller regarding environmental contamination.  The Fifth Circuit held that the covenant did not "touch and concern" the land and that any burden or benefit created by the TRMI deed affected only TRMI personally and had no impact on the land itself.  302 F.3d at 356. The covenant was a contractual arrangement personal to TRMI and did not qualify as a covenant.  *Id*. at 357.  The same is true here of Union's agreement with ATP for indemnity.

In *International Interests*, Judge Lee Rosenthal of the Southern District relied on *In Re El Paso Refinery*, in holding that an agreement in a deed of trust to obtain property insurance and name the lender as a loss payee was a personal covenant that did not benefit or burden the property and it did not "run with the land."  2012 WL 3776483 at *4.  The Union/ATP Agreement is the same.

Again, as stated above, to the extent Sojitz agreed to do anything with regard to the Union/ATP Agreement, those obligations were extinguished and released by ATP in 2009.

## VI.   CONCLUSION

Sojitz is entitled to reimbursement of 100% of the costs it spent to decommission GB 142 and 186.  Sojitz is owed **$8,403,909** by Union.  Sojitz performed all of the work of decommissioning for Union's benefit and is subrogated to the claims of the U.S. government under the regulations discussed above.

In the alternative, Sojitz is entitled to judgment for 80% of the amounts paid for decommissioning work being the sum of **$6,723,127.50**, being Union's 80% share of the net total costs incurred by Sojitz.

Union should take nothing on its counterclaims and those claims should be dismissed with prejudice.

4829-2896-9329v.1

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

/s/ D. Mitchell McFarland
D. Mitchell McFarland
State Bar No.:  13597700
Fed. Bar No. 2379
mmcfarland@munsch.com
700 Milam, Suite 2700
Houston, Texas 77002
Telephone:  (713) 222-1470
Fax:   (713) 222-1475

***ATTORNEY IN CHARGE FOR PLAINTIFF
SOJITZ ENERGY VENTURE, INC.***

**OF COUNSEL**

**MUNSCH HARDT KOPF & HARR, P.C.**
Carrie Schadle
cschadle@munsch.com
Texas State Bar No. 24051618
700 Milam Street, Suite 2700
Houston, Texas 77002
713.222.1470 (T)
712.222.1475 (F)

## CERTIFICATE OF SERVICE

This certifies that, on September 4, 2018, a copy of the foregoing filing was electronically submitted with the clerk of the court of the United States District Court for the Southern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served the below counsel of record electronically or by any other manner authorized by Federal Rule of Civil Procedure 5(b)(2).

John V. Anaipakos
Meghan Dawson McElvy
Liam O'Rourke
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002-4995

*/s/ D. Mitchell McFarland*
D. Mitchell McFarland

25