# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| SOJITZ ENERGY VENTURE, INC. | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:17-cv-02941 |
| | § | |
| UNION OIL COMPANY OF | § | |
| CALIFORNIA, | § | |
| | § | |
| *Defendant.* | § | |

**DEFENDANT UNION OIL COMPANY OF CALIFORNIA'S MEMORANDUM OF LAW IN SUPPORT OF ITS RESPONSE TO PLAINTIFF SOJITZ ENERGY VENTURE, INC.'S MOTION FOR SUMMARY JUDGMENT AND ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ....................................................................................... 1

II.  NATURE AND STAGE OF PROCEEDINGS ................................................. 2

III.  ISSUES PRESENTED.................................................................................. 2

IV.  STANDARD OF REVIEW ........................................................................... 3

V.  SUMMARY OF ARGUMENT ....................................................................... 3

VI.  FACTUAL BACKGROUND.......................................................................... 5

    A.  Union leased GB 142 and GB 186 but did not conduct any operations before assigning its operating interests to ATP............................................. 5

    B.  ATP assigned 20% of its operating interest to Sojitz, and Sojitz agreed to indemnify Union for 100% of the decommissioning obligations. ................ 7

    C.  Sojitz reassigned its operating interest in the Leases back to ATP, and ATP subsequently declared bankruptcy. .............................................................. 7

    D.  BSEE first ordered Sojitz to decommission the Leases on October 29, 2013 and turned to Union eight months later only after Sojitz failed to timely comply. ........................................................................................................ 8

    E.  Union sent Sojitz an initial cost estimate to decommission of $32.2 million after which Sojitz agreed to serve as the designated operator. ..................... 9

VII.  ARGUMENTS AND AUTHORITIES............................................................ 11

    A.  The plain language of the operative agreements controls this dispute and requires Sojitz to indemnify Union for the decommissioning costs in issue. ................................................................................................................ 11

        1.  Sophisticated parties are free to apportion rights and liabilities between themselves beyond their regulatory duties; here, the parties did just that. ..................................................................................... 11

        2.  The terms of the Union Agreement and the Sojitz Assignments mandate that Sojitz indemnify Union for decommissioning. .......... 12

i.      Sojitz executed the Participation Agreement and the Sojitz Assignments with full knowledge that its rights and obligations were "subject to" the Union Agreement. ........... 13

ii.    Union is entitled to enforce the Sojitz Assignments and Participation Agreement as an intended third-party beneficiary. ........................................................................ 15

iii.   Once vested, Sojitz cannot deprive Union of its right to indemnity. ............................................................... 17

3.     Sojitz's cited authority is inapposite here because Union and Sojitz were never co-operators under a joint operating agreement. ........... 18

B.    Sojitz's equitable claims fail as a matter of law and equity. ....................... 21

1.     Equitable subrogation is not available to enforce BOEM regulations as a private cause of action. .............................................. 21

2.     Sojitz's remaining equitable claims for contribution, unjust enrichment, or quantum meruit are incompatible with long-standing Texas law. ....................................................................... 24

VIII.  CONCLUSION ......................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amerisure Ins. Co. v. Navigators Ins. Co.*,
611 F.3d 299 (5th Cir. 2010) ............................................................. 23

*Bay Rock Operating Co. v. St. Paul Surplus Lines Ins. Co.*,
298 S.W.3d 216 (Tex. App.—San Antonio 2009, pet. denied) .................................. 23

*Beech Aircraft Corp. v. Jinkins*,
739 S.W.2d 19 (Tex. 1987) .................................................................. 24

*Farragut Fin. Corp. v. Capital One Auto Fin., Inc.*,
No. 01-07-00497-CV, 2008 WL 4367822 (Tex. App.—Houston [1st
Dist.] Sept. 25, 2008, no pet.) ........................................................ 23

*First Bank v. Brumitt*,
519 S.W.3d 95 (Tex. 2017) ............................................................. 4, 17

*Fortis Benefits v. Cantu*,
234 S.W.3d 642 (Tex. 2007) ................................................................. 23

*Fortune Prod. Co. v. Conoco, Inc.*,
52 S.W.3d 671 (Tex. 2000) .................................................................. 25

*Fruge ex rel. Fruge v. Parker Drilling Co.*,
337 F.3d 558 (5th Cir. 2003) ........................................................ 11, 22

*Frymire Eng'g Co., Inc. ex rel. Liberty Mut. Ins. Co. v. Jomar Intern., Ltd.*,
259 S.W.3d 140 (Tex. 2008) ................................................................. 22

*GOM Shelf, LLC v. Sun Operating Ltd. P'ship*,
No. 4:06-CV-3444, 2008 WL 901482 (S.D. Tex. Mar. 31, 2008) ................. 19, 20, 21

*Green v. Life Ins. Co. of N. Am.*,
754 F.3d 324 (5th Cir. 2014) ............................................................... 3

*Hester v. Friedkin Cos., Inc.*,
132 S.W.3d 100 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) ..................... 25

*Hous. Lighting & Power Co. v. Wheelabrator Coal Servs. Co.*,
788 S.W.2d 933 (Tex. App.—Houston [14th Dist.] 1990, no writ) ........................... 17

*In re Kellogg Brown & Root, Inc.*,
166 S.W.3d 732 (Tex. 2005) .................................................................. 24

*In re Tex. Rangers Baseball Partners*,
498 B.R. 679 (Bankr. N.D. Tex. 2013) .................................................. 16

*In re Tri-Union Development Corp.*,
314 B.R. 611 (Bankr. S.D. Tex. 2004) ................................................... 22

*In re Velocita Worldwide Logistics, Inc.*,
608 F.3d 212 (5th Cir. 2010) ................................................................. 24

*Inwood N. Homeowners Ass'n, Inc. v. Harris*,
736 S.W.2d 632 (Tex. 1987) .................................................................. 21

*MCI Telecomm. Corp. v. Tex. Util. Elec. Co.*,
995 S.W.2d 647 (Tex. 1999) .................................................................. 16

*Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*,
236 S.W.3d 765 (Tex. 2007) .................................................................. 21

*Murray v. Cadle Co.*,
257 S.W.3d 291 (Tex. App.—Dallas 2008, pet. denied) ........................... 22

*Pepi Corp. v. Galliford*,
254 S.W.3d 457 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ........ 25

*Rowan Companies, Inc. v. Acadian Ambulance Serv., Inc.*,
No. H-05-3400, 2008 WL 1989791 (S.D. Tex. May 2, 2008) .................. 18

*San Pedro State Bank v. Engle*,
643 S.W.2d 450 (Tex. App.—San Antonio 1982, no writ) ....................... 17

*Smart v. Tower Land & Inv. Co.*,
597 S.W.2d 333 (Tex. 1980) .................................................................. 23

*Stine v. Stewart*,
80 S.W.3d 586 (Tex. 2002) .................................................................... 16

*Total E&P USA, Inc. v. Marubeni Oil & Gas (USA), Inc.*,
No. 4:16-cv-2671 (S.D. Tex. June 28, 2018) ................................. 12, 20, 21

*Turner v. Baylor Richardson Med. Ctr.*,
476 F.3d 337 (5th Cir. 2007) ................................................................... 3

*Westland Oil Dev. Corp. v. Gulf Oil Corp.*,
    637 S.W.2d 903 (Tex. 1982) ......................................................................... 21

**OTHER AUTHORITIES**

62 Fed. Reg. 27,948 ........................................................................................ 11

FED. R. CIV. P. 56(a) ........................................................................................ 3

Restatement (Second) of Contracts § 311 (1981) ........................................... 18

# I.   INTRODUCTION

Federal and state law applicable to this offshore decommissioning liability dispute have long-allowed parties to enter into private agreements that allocate responsibility among themselves for the costs of government-mandated clean-up activities. This law has been applied in a variety of contexts, including the BOEM-mandated decommissioning regulations that form the backdrop to this lawsuit.  Plaintiff Sojitz Energy Venture, Inc. ("Sojitz") asks this Court to disregard that longstanding precedent and hold that it is not bound by the terms of agreements it expressly assumed and agreed would control, and which render it 100% liable for the very decommissioning costs it now seeks to recover from Defendant Union Oil Company of California ("Union").

Unable to reconcile the agreements' plain language with its contention that Union should bear 100% of the decommissioning costs in issue, Sojitz resorts to: (1) misframing this case as though it involves Union's liability to the government for decommissioning if Sojitz did not exist (which is <u>not</u> in dispute); and (2) pursuing equitable claims that are not only belied by the plain language of the operative agreements but by numerous, independent defenses as a matter of law.  Sojitz's claims are further undermined by its own prior communications to Union in which it consistently acknowledged its obligation to pay at least 20% of the decommissioning costs.  And while Sojitz objects to finding itself on the hook for roughly $8.4 million in decommissioning expenses, this result is hardly inequitable:  it was Sojitz's (not Union's) active participation in drilling activity (along with its now defunct co-lessee, ATP) that led to the installation of a platform, wells, and other facilities that eventually required decommissioning in the first instance.

By invoking equity to impose liability, Sojitz necessarily asks this Court to excuse Sojitz from its contractual agreements to bear—as between it and Union—100% of the liability for decommissioning the offshore leases blocks at issue. The Court should decline Sojitz's invitation to disregard well-established federal and Texas contract law.

## II.    NATURE AND STAGE OF PROCEEDINGS

Union, now owned by Chevron, is the former lessee of record of Garden Banks Blocks 142 and 186 ("GB 142" and "GB 186;" collectively, the "Leases"), located in the Gulf of Mexico offshore Texas. ATP Oil & Gas Corporation ("ATP") and Sojitz are the former co-owners of operating rights under the Leases. Following ATP's bankruptcy, Sojitz decommissioned certain wells, facilities, and a platform on the Leases. Sojitz then sued Union to recover $10,016,698 in costs that it incurred decommissioning the Leases. Union answered, denying liability for the decommissioning costs based on Sojitz's contractual indemnification obligations and asserting its own counterclaim for declaratory judgment. Sojitz recently received a $1,612,788.97 reimbursement for decommissioning GB 142 from trust funds set aside in ATP's bankruptcy. Thus, Sojitz's out-of-pocket decommissioning costs now total $8,403,909.[1]

## III.    ISSUES PRESENTED

1. Whether the plain language of the relevant agreements renders Sojitz contractually liable for all decommissioning costs at issue in this lawsuit as a matter of law, thereby defeating Sojitz's equitable claims for reimbursement of decommissioning costs and further entitling Union to summary judgment on its cross-claim for declaratory judgment.

---

[1]    On August 3, 2018, the Parties filed a joint stipulation that the decommissioning costs Sojitz incurred were reasonable and necessary. (*See* DE 14, Stipulation of Facts.)

2.   Whether Sojitz's equitable claims fail as a matter of law on the additional grounds
pleaded by Union in its defenses.

## IV.   STANDARD OF REVIEW

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). "When parties file cross-motions for summary judgment," the Fifth Circuit reviews "each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Id.*  The nonmoving party must direct the court to more than a scintilla of evidence and may not rest on the pleadings or other unsubstantiated allegations. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345–46 (5th Cir. 2007).

## V.   SUMMARY OF ARGUMENT

Sojitz's summary judgment motion should be denied in its entirety because the plain language of the agreements shows that Sojitz's obligation to Union is to:

- "indemnify and hold Union harmless from any and all risk or liability associated with ATP's operations on the Leases;"

- conduct "[a]ll operations" "free of any cost and/or liability of any kind or character to Union;" and

- "assume all obligations owed to Union," including "all risk, liability, costs or expenses incurred in connection with drilling, testing, completing, and equipping [ ] wells or plugging or abandoning [ ] wells."

(DE 1, Compl., Ex. 3 ¶¶ 7–8.)  Nothing about the unequivocal language above, which Sojitz expressly incorporated by reference into its agreement with ATP and associated assignments, limits Sojitz's liability to 20% of the decommissioning obligations or, conversely, imposes liability on Union for 80% (much less 100%) of the decommissioning

obligations. To the contrary, the agreements, when harmonized, place 100% of that liability on Sojitz.

Sojitz's position is either that: (1) it is not responsible for any decommissioning obligations because it reassigned its ownership rights back to ATP, or (2) it is, at most, 20% responsible for decommissioning obligations because it only acquired 20% of the operating rights from ATP. In addition to ignoring the plain language excerpted above, Sojitz's position ignores (or misstates) several other important facts:

- In its prior correspondence, Sojitz consistently acknowledged its obligation to pay *at least* its 20% operating rights interest share of decommissioning costs, which is contrary to its litigation-driven position;

- While Sojitz may have assumed only a 20% liability for decommissioning obligations with respect to ATP, its liability to Union was not so limited in the relevant agreements;

- BSEE contacted Sojitz *first* to carry out the decommissioning work on GB 142 and GB 186, contacting Union only after Sojitz failed to comply with BSEE's orders; and

- Sojitz's reassignment of its 20% operating rights interest back to ATP had no effect on its liability to Union that accrued the moment Sojitz agreed to become a co-owner of operating rights subject to the terms of the Union Agreement.

Sojitz's motion also distorts the equities of this case, which if anything strongly favor Union. For starters, although Union was the lessee of record during the entire term of the Leases, it never drilled any of the wells or installed any of the other facilities that required decommissioning. Rather, it was Sojitz's active participation in drilling activity (with ATP) that led to the need to decommission wells and facilities on GB 142 and GB 186. Moreover, Sojitz's receipt of production benefits during its period

of ownership offset its decommissioning burdens. Finally, Sojitz's knowledge that, as between itself and the government, it was always potentially on the hook for 100% of the decommissioning obligations under long-standing federal regulations belies all insinuations of unfairness and surprise that pervade Sojitz's motion. Simply put, there is nothing inequitable about holding Sojitz liable for 100% of the decommissioning obligations for wells and facilities that it and ATP drilled and/or installed, respectively.

Finally, each of Sojitz's equitable claims fails for additional legal reasons. First, Sojitz's contribution claim is barred because Union and Sojitz were not bound as co-obligors for decommissioning obligations (such as if they had been co-operators under a joint operating agreement). Second, Sojitz's quantum meruit and unjust enrichment claims are barred by the existence of express agreements, which govern the subject matter of Sojitz's claims and the relief it seeks. Third, and finally, Sojitz's claim for equitable subrogation is barred because Sojitz lacks standing to pursue, on behalf of the government, any alleged violations of BOEM and BSEE regulations.

## VI.    FACTUAL BACKGROUND

### A.    Union leased GB 142 and GB 186 but did not conduct any operations before assigning its operating interests to ATP.

Effective December 1, 1999, Union obtained from the United States two offshore oil and gas leases covering GB 142 and GB 186 located offshore Texas. (DE 1, Compl., Exs. 1 & 2.) Less than one year later, on November 21, 2000, Union assigned 100% of its operating rights under the Leases up to a depth of 6,500 feet to ATP (the "Union

Agreement").[2]  (*Id.*, Ex. 3.)  Critically, the Union Agreement required ATP to indemnify

and hold Union harmless from any and all risk or liability associated with ATP's operations

on GB 142 and GB 146, including plugging or abandoning wells.  (Ex. A, Declaration of

Richard N. Weaver ("Weaver Decl.") ¶ 3.)  Moreover, ATP agreed in the Union Agreement

that it would not assign any of the rights it acquired without requiring its assignees to

expressly assume *all* obligations owed to Union under the terms of the Union Agreement.

(*Id.*)  The relevant paragraphs of the Union Agreement provide in their entirety:

> 7.  ***ATP will indemnify and hold Union harmless from any and all risk or liability associated with ATP's operations on the Leases***.  All operations conducted under the terms of this Agreement, shall be free of any cost and/or liability of any kind or character to Union, and ***all risk, liability, costs or expenses incurred in connection with*** drilling, testing, completing, and equipping said well or wells or ***plugging or abandoning said well or wells shall be borne solely by ATP***.

> 8.  ***ATP agrees that it will not assign***, sublease or transfer, in whole or part, any rights acquired herein ***without requiring its assignees***, sublessees, and transferees ***to expressly assume all obligations owed to Union*** under the terms of this Agreement, and all such pertinent terms shall be incorporated into any and all future instruments translative of title.  Any assignment, sublease or transfer executed in contravention of this provisions, shall be null and void.  Notwithstanding ATP's right to assign all or part of the interest acquired, or to be acquired hereunder to third parties, ATP shall remain fully responsible and liable for fulfillment of all the obligations and liabilities imposed herein, whether express or implied.  Specifically, ATP shall have the right to mortgage, pledge, or otherwise grant a security interest in all, or any part of ATP's interest in the Leases; however, in any such instrument granted there shall be a provision therein stating the same is subservient to the rights of Union set forth in this Agreement.

---

[2]     Union also obtained a minor overriding royalty interest in each of the Leases (3% for GB 142 and 5% for GB 186).

(DE 1, Compl., Ex. 3 ¶¶ 7–8 (emphases added).)  In the less-than-one-year period that Union owned all of the operating rights to GB 142 and GB 186, Union did not develop the Leases.  (Ex. A, Weaver Decl. ¶ 4.)  Specifically, it did not drill any wells or install any platforms or other facilities on the Leases.  (*Id.*)

**B.     ATP assigned 20% of its operating interest to Sojitz, and Sojitz agreed to indemnify Union for 100% of the decommissioning obligations.**

By letter agreement dated April 25, 2003, ATP agreed to assign 20% of the operating rights it had acquired from Union to Sojitz (the "Participation Agreement").  (*See* DE 1, Compl., Ex. 4.)  As required under the terms of the Union Agreement, the Participation Agreement and the assignments for each of the Leases (the "Sojitz Assignments") (*see id.*, Ex. 6) were expressly made subject to, and incorporated by reference, the Union Agreement for all purposes.  (*Id.*, Ex. 4 ¶¶ 4, 4(e).)  Moreover, the Sojitz Assignments provided that, in the event of a conflict between the terms of the Sojitz Assignments and the terms of the Union Agreement, the terms of the Union Agreement would control.  (*Id.*, Ex. 6 ¶ 1.)  During the period that both ATP and Sojitz owned their respective interests in the Leases, the GB 142 A001 and the GB 186 A002 wells were drilled and completed.  (Ex. A, Weaver Decl. ¶ 5.)  In addition, the GB 142 Platform A was installed, as was pipeline segment 14189 on and across GB 142.  (*Id.*)

**C.     Sojitz reassigned its operating interest in the Leases back to ATP, and ATP subsequently declared bankruptcy.**

In 2009, after six years of joint operations, infrastructure investments, and shared production, Sojitz ended its partnership with ATP and sold its operating interest in 11 offshores leases back to ATP in a Purchase and Sale Agreement (the "PSA").  (*See*

DE 1, Compl., Ex. 8; *see also* Ex. E, Declaration of Scott Ritter ("Ritter Decl.") ¶ 3 (noting that "GB 142 and GB 186 produced oil and/or gas from 2003–2012"). Included within the PSA were Sojitz's interests in GB 142 and GB 186. (DE 1, Compl., Ex. 8, Ex. A.) ATP and Sojitz separately executed the Sojitz Reassignments, which apply specifically to GB 142 and GB 186. (*See id.*, Ex. 7.)

Like the Union Agreement, the PSA also includes an indemnity provision that gives Sojitz indemnity against ATP for future costs, including decommissioning. (*Id.*, Ex. 8 ¶ 11.3(b).) In partial consideration for this indemnity right, Sojitz remitted $4.75 million to ATP as a "negative value" payment. (*Id.* ¶ 2.2.) This lump sum, unallocated payment applies to all 11 leases conveyed under the PSA; it is not tied to any particular obligations, rights, or liabilities, and certainly not to the GB 142 and GB 186 decommissioning obligations specifically. (*Id.*)

On August 7, 2012, after the Leases had expired, ATP filed for bankruptcy and was eventually authorized to abandon its obligations under the Leases. (*Id.* ¶ 13–14.) As a result, ATP informed BSEE that it would not decommission the Leases. (*Id.*)

**D.      BSEE first ordered Sojitz to decommission the Leases on October 29, 2013 and turned to Union eight months later only after Sojitz failed to timely comply.**

After ATP abandoned the Leases, BSEE sent Sojitz letters dated October 29, 2013, in which it ordered Sojitz, as ATP's former operating rights co-lessee, to decommission all wells, pipelines, platforms, and other facilities located on GB 142 and GB 186 by October 23, 2014. (Ex. A, Weaver Decl. ¶ 7, Decl. Ex. 1, 10/29/13 BSEE Ltrs. to Sojitz.) In the same letters, BSEE also ordered Sojitz to *immediately* undertake

maintenance of the facilities and wells on GB 142 and GB 186 pending completion of decommissioning operations. (*Id.*) BSEE did not send any such letters or other communication to Union at this time.[3] (*Id.*)

None of the facilities that BSEE ordered Sojitz to decommission on GB 142 and GB 186 were placed there by Union. (Ex. A, Weaver Decl. ¶ 8.) Instead, they were placed there by ATP and/or its operating rights co-lessee, Sojitz. (*Id.*)

It was not until June 20, 2014—nearly eight months later—that Union first received letters from BSEE indicating that it, in addition to Sojitz, was responsible for decommissioning the wells, platform, and other facilities on GB 142 and GB 186. (*Id.* ¶ 9, Decl. Ex. 2, 6/20/14 BSEE Ltrs. to Union.) BSEE contacted Union only because Sojitz had not complied with BSEE's October 29, 2013 orders. (*Id.* ¶ 9.) In fact, when Union sent a contractor out to inspect GB 142 and GB 186 in December 2014, it was apparent that no interim maintenance had been performed, as evidenced by some navigation aid lights not functioning and a foghorn only partially working. (*Id.*)

**E.    Union sent Sojitz an initial cost estimate to decommission of $32.2 million after which Sojitz agreed to serve as the designated operator.**

Following Union's initial inspection, and in light of Sojitz's lack of compliance with BSEE's October 29, 2013 orders, Union developed a preliminary cost estimate for carrying out the decommissioning work on GB 142 and GB 186 of $32.2 million. (*Id.* ¶ 10.) Union provided this cost estimate to Sojitz in a technical meeting

---

[3]    Indeed, the last entry on the BOEM Serial Register Pages for GB 142 and GB 186 (dated November 1, 2013) states: "as former operating rights co-lessee, Sojitz Energy Venture, Inc. is responsible for and ordered to decommission all wells, pipelines, platforms, and other facilities by 10/23/2014." (Ex. F, BOEM Serial Register Pages.) No such entry was made as to Union.

between the parties in or about May 2015. (*Id.*) It was not until after the initial technical meeting in or about May 2015, after receiving Union's initial cost estimate of $32.2 million, that Sojitz finally agreed to serve as the designated operator for decommissioning. (*Id.* ¶ 11.) That resulted in a joint letter to BSEE on June 26, 2015, confirming that Sojitz would serve as the designated operator to decommission the facilities and wells located on GB 142 and GB 186. (*Id.*, Decl. Ex. 3, 6/26/15 Joint Letter to BSEE.)

Although Sojitz disputed that it was 100% responsible for the costs of the decommissioning work, it consistently acknowledged that it was obligated to pay its undivided 20% operating rights interest share. (*Id.* ¶ 12; *see also* Ex. B, Sojitz 9/12/14 Ltr. to Union ("Sojitz recognizes that it is obligated to pay its undivided 20% Operating Rights interest share . . . ."); Ex. C, Sojitz 12/8/14 Ltr. to Union ("Our client recognizes, however, its obligation to bear its 20% Operating Rights share of the costs thereof.").) Union, by contrast, consistently informed Sojitz that Sojitz was solely responsible for decommissioning the Leases. (Ex. A, Weaver Decl. ¶ 12, Decl. Ex. 4, Weaver 5/12/17 Email to Sojitz; *see also* Ex. D, Union 10/1/14 Ltr. to Sojitz.) Sojitz's claim in this lawsuit that Union is 100% responsible for the decommissioning costs is completely contrary to Sojitz's prior communications. (Ex. A, Weaver Decl. ¶ 12.) It appears that what really motivated Sojitz to finally engage with Union and BSEE was its desire to minimize decommissioning costs, for which Sojitz agreed it bore at least a 20% share and believed it could reduce if it served as the designated decommissioning operator over Union. (*Id.*)

# VII. ARGUMENTS AND AUTHORITIES

## A. The plain language of the operative agreements controls this dispute and requires Sojitz to indemnify Union for the decommissioning costs in issue.

Union does not dispute that former interest owners and operators are jointly and severally liable *to the government* for decommissioning obligations under BOEM regulations. But the issue here is, *as between Union and Sojitz*, who bears responsibility. In that regard, Sojitz expressly agreed to indemnify and hold Union harmless for any claims arising from GB 142 and GB 186, including decommissioning obligations. Its attempt to avoid this contractual obligation by a misplaced appeal to equity runs afoul of well-established federal and Texas law and should be denied.

### 1. Sophisticated parties are free to apportion rights and liabilities between themselves beyond their regulatory duties; here, the parties did just that.

Sojitz's motion misframes the central issue in this case. It suggests that, because all former interest holders have joint-and-several liability with respect to the government, they also have joint-and-several liability with respect to one another. However, these regulations provide a *baseline* and apply only with respect to the government. Leaseholders have long been free to reallocate various rights and obligations with respect to one another by private contract. *See* 62 Fed. Reg. 27,948, 27,949–50 (agency response to comments, stating "[w]hile this rule determines who is liable to [BOEM] for performance of nonmonetary obligations, it is not our intention that this rule preclude private agreements concerning the allocation of liabilities between the affected parties"); *see also Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 563 (5th Cir. 2003) ("The [BOEM] regulations govern the parties' joint and several liabilities vis-à-vis

the Government, not amongst themselves."); *Total E&P USA, Inc. v. Marubeni Oil & Gas (USA), Inc.*, No. 4:16-cv-2671 (S.D. Tex. June 28, 2018) ("Thus, parties will always be jointly and severally liable to the government for the cost of decommissioning, no matter what their contract provides, but they are free to reallocate the sharing of costs among themselves in their contract.").

A brief hypothetical makes this point abundantly clear: if Sojitz had never entered the picture as a joint operator with ATP, Union would be liable to BSEE for 100% of the GB 142 and GB 186 decommissioning costs, despite its right to indemnity from ATP. By the same token, if Union no longer existed, there is no doubt that Sojitz would now be 100% responsible to BSEE, notwithstanding the reassignment of its operating rights interests back to ATP. This just proves that it is the parties' liabilities with respect to one another, not to the government, that controls the outcome of this dispute.

2.    **The terms of the Union Agreement and the Sojitz Assignments mandate that Sojitz indemnify Union for decommissioning.**

Against the backdrop of BOEM's regulatory scheme, Union, ATP, and Sojitz signed a series of agreements designed to govern the parties' relationships with one another. Union's reading of the relevant agreements harmonizes and gives full meaning to the plain language of all the agreements. By contrast, Sojitz's reading ignores the fact that its agreements with ATP were made expressly subject to the Union Agreement and stated that, in the event of a conflict, the terms of the Union Agreement control.

### i. Sojitz executed the Participation Agreement and the Sojitz Assignments with full knowledge that its rights and obligations were "subject to" the Union Agreement.

When Sojitz joined ATP as an operator in the Leases, it did so pursuant to all of the terms of the Union Agreement, including its indemnification provisions. (*See* DE 1, Compl., Ex. 4. ¶ 4.) In particular, the Union Agreement makes clear that ATP's (and correspondingly, Sojitz's) obligation to Union was to:

- "indemnify and hold Union harmless from any and all risk or liability associated with ATP's operations on the Leases;"

- conduct "[a]ll operations" "free of any cost and/or liability of any kind or character to Union;" and

- "assume all obligations owed to Union," including "all risk, liability, costs or expenses incurred in connection with drilling, testing, completing, and equipping [ ] wells or plugging or abandoning [ ] wells."

(*See* DE 1, Compl., Ex. 3 ¶¶ 7–8.)

Equally important, ATP "agree[d] that it will not assign, sublease or transfer, in whole or part, any rights acquired herein without requiring its assignees, sublessees, and transferees to expressly assume all obligations owed to Union under the terms of this Agreement." (*Id.* ¶ 8.) Thus, not only did ATP have to "indemnify and hold Union harmless" for "plugging or abandoning [] wells," it was required to ensure that all assignees "expressly assume" that same obligation. (*Id.* ¶¶ 7–8.) This included Sojitz as ATP's assignee.

Sojitz's agreements with ATP also make clear that Sojitz inherited ATP's obligations to Union. The Sojitz Assignments expressly state that Sojitz "specifically assumes and undertakes the obligations, liabilities and *indemnifications* contained in the

[Union Agreement]." (*Id.*, Ex. 6 ¶ 1 (emphasis added).) The Participation Agreement between ATP and Sojitz contained similar language: "This Participation Agreement is subject to the Union Agreement which is incorporated herein by reference. The Union Agreement provides, among other things, that . . . ATP will indemnify Union with respect to ATP's operations." (*Id.*, Ex. 4 ¶¶ 4, 4(e).)

Reading these agreements in concert, there is no doubt that Sojitz knowingly accepted the responsibility to indemnify Union. The indemnification language, both in the Union Agreement and Sojitz's agreements with ATP, was broad and designed to cover "all obligations," including decommissioning costs. (*See id.*, Ex. 3 ¶ 7.)

In fact, Sojitz concedes that this language made it liable to Union and ATP for decommissioning costs. (Sojitz MSJ at 10.) It argues, however, that it only "took on 20% of that responsibility under its agreement with ATP." (*Id.*) But nothing about the Union Agreement's unequivocal language, which Sojitz expressly incorporated by reference into the Participation Agreement and the Sojitz Assignments, limits Sojitz's obligation to indemnify Union to 20%. To the contrary, the Union Agreement, the Participation Agreement, and the Sojitz Assignments, when read together, require ATP and Sojitz to indemnify Union for all costs and liabilities.

Sojitz nonetheless leans heavily on the Sojitz Assignments' fourth paragraph, in which Sojitz agreed to "assume and be liable for its proportionate share of all obligations pertaining to the Assigned Premises, including but not limited to the obligation to bear its share of the cost, risk and expense to plug and abandon any . . . facilities pertaining to the Assigned Premises." (DE 1, Compl., Ex. 6 ¶ 4.) Sojitz claims this paragraph limits Sojitz's

exposure to its proportionate share. But this interpretation ignores the language just three paragraphs above it, which incorporates all of the Union Agreement's obligations, including the "indemnifications contained in the [Union Agreement]." (*Id.* ¶ 1.) Paragraph 4 contains no language that can be reasonably construed as controlling Sojitz's obligations with respect to Union. Thus, while Sojitz may only be liable to ATP for 20% of the decommissioning costs, it shares 100% accountability for Union's indemnification with ATP. Accordingly, Sojitz agreed to indemnify Union for *all* of Union's liabilities associated with the Leases, in addition to Sojitz's direct liability to ATP for a proportionate share of the decommissioning costs.

Even if these clauses created some ambiguity in the Sojitz Assignments' otherwise clear language incorporating the Union Agreement, the Sojitz Assignments expressly state that "in the event of a conflict between the terms and provisions of this [Sojitz Assignment] and the terms and provisions of the [Union Agreement], the terms and provisions of the [Union Agreement] shall control." (DE 1, Compl., Ex. 6 ¶ 1.) The analysis above shows that there is no conflict here because the Union Agreement is clear that all of ATP's assignees must indemnify Union for 100% of decommissioning costs.

### ii. Union is entitled to enforce the Sojitz Assignments and Participation Agreement as an intended third-party beneficiary.[4]

Contrary to Sojitz's argument, Union is entitled to enforce Sojitz's repeated acknowledgement and acceptance of the broad indemnity provision in the Union

---

[4]  Because Union is not moving for summary judgment on its breach-of-contract claim, the Court need not decide the issue of whether Union is a third-party beneficiary of the Participation Agreement and Sojitz Assignments. Rather, the Court can simply construe the agreements together and conclude that they render Sojitz 100% liable for the decommissioning costs it seeks to recover against Union, and thus, Sojitz's claims fail as a matter of law.

Agreement as a vested third-party beneficiary. The Sojitz Assignments expressly incorporated the Union Agreement's indemnification clause, thereby conferring a direct benefit on Union. This made Union a third-party beneficiary to the Sojitz Assignments and allows Union to enforce its rights under those agreements.

Texas law has long-allowed a third party to enforce a preexisting "contractual obligation or other legally enforceable commitment owed to the third party" where the subsequent contract "expressly requires" the contracting parties to satisfy the preexisting obligation. *See Stine v. Stewart*, 80 S.W.3d 586, 589–90 (Tex. 2002). In "determining whether a third party can enforce a contract, the intention of the contracting parties is controlling." *MCI Telecomm. Corp. v. Tex. Util. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999). "To determine the parties' intent, courts must examine the entire agreement when interpreting a contract and give effect to all the contract's provisions so that none are rendered meaningless." *Stine*, 80 S.W.3d at 589. "A third-party beneficiary does not have to show that the signatories executed the contract solely to benefit the non-contracting party, but rather, the focus is on whether the contracting parties intended, at least in part, to discharge an obligation owed to a third party." *In re Tex. Rangers Baseball Partners*, 498 B.R. 679, 702 (Bankr. N.D. Tex. 2013) (emphasis in original) (applying Texas law). "[A] party proves itself to be a third-party beneficiary if the performance of the contract will satisfy a legal duty owed to it, which may be an indebtedness, contractual obligation or other legally enforceable commitment owed to the third party." *Id.* (internal quotation marks omitted).

Here, Union is unquestionably a third-party beneficiary to the Participation Agreement and the Sojitz Assignments, all of which were entered subject to and incorporated by reference the Union Agreement. ATP and Sojitz spelled out multiple times their intent to confer a direct benefit on Union—*i.e.*, indemnification for operations associated with the Leases, including decommissioning obligations. Those contracts specifically referenced Union by name and incorporated specific provisions from the Union Agreement, including the indemnification clause. As a third-party beneficiary, Union has the right to enforce the contracts between Sojitz and ATP. *See First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017); *see also Stein*, 80 S.W.3d at 589–90. In enforcing this right to indemnity as a third-party beneficiary, Union cannot be made to reimburse Sojitz for the decommissioning costs. Thus, Sojitz's claim for such reimbursement necessarily fails.

### iii. Once vested, Sojitz cannot deprive Union of its right to indemnity.

Sojitz's reassignment of its operating rights six years later did not disturb Union's vested rights as a third-party beneficiary. "After a third-party beneficiary contract has been accepted by the third-party beneficiary, it cannot be rescinded or modified without the subsequent consent of the third party beneficiary." *See San Pedro State Bank v. Engle*, 643 S.W.2d 450, 456 (Tex. App.—San Antonio 1982, no writ); *Hous. Lighting & Power Co. v. Wheelabrator Coal Servs. Co.*, 788 S.W.2d 933, 937 (Tex. App.—Houston [14th Dist.] 1990, no writ) ("It is settled in Texas that, after a contract for the benefit of a third person has been accepted or acted on by him, it cannot be rescinded by the parties without his consent."). Under the Restatement's approach, "the power to modify terminates the moment the beneficiary (1) materially changes position in justifiable reliance on the

agreement, (2) brings suit pursuant to the agreement, or (3) otherwise manifests assent to the agreement." *Rowan Companies, Inc. v. Acadian Ambulance Serv., Inc.*, No. H-05-3400, 2008 WL 1989791, at *4 (S.D. Tex. May 2, 2008) (citing Restatement (Second) of Contracts § 311 (1981)). As the lessee of record, Union was aware of all assignments involving the Leases and materially relied on the broad indemnity language in the Union Agreement. Accordingly, Sojitz cannot now rewrite the plain language of the relevant agreements without Union's consent.

### 3. Sojitz's cited authority is inapposite here because Union and Sojitz were never co-operators under a joint operating agreement.

Sojitz invokes the *Seagull Energy* line of cases to support its motion, where courts were asked to allocate offshore decommissioning obligations based on the applicable language of joint operating agreements (or "JOAs"). While those cases demonstrate the threshold principle that parties are free to redistribute obligations among one another by private contract, they are substantively distinct from the matter at hand.

Each of those cases involved a former joint operator attempting to avoid sharing costs with a former co-operator. In *Seagull Energy*, Eland Energy purchased a working interest from Seagull Energy and entered into "two offshore operating agreements." 207 S.W.3d at 344. Eland later assigned its interest. *Id.* When the assignee defaulted on its obligations under the JOAs, Seagull sought to hold Eland liable. *Id.* Looking to the JOAs' language, the Texas Supreme Court held that Eland was responsible for its assignee's proportionate share of the costs because "Seagull did not expressly release Eland following the assignment of its working interest." *Id.* at 346–47.

Subsequent courts have since applied *Seagull Energy*'s "express release" requirement to decommissioning disputes, but only where the parties were co-operators under a JOA. *E.g.*, *GOM Shelf, LLC v. Sun Operating Ltd. P'ship*, No. 4:06-CV-3444, 2008 WL 901482, at *1 (S.D. Tex. Mar. 31, 2008). In *GOM Shelf*, Texaco assigned 100% of its interest in an offshore lease to Sun (50%) and Oxy (50%). Those two assignees became co-operators and entered a JOA. *See id.* at *2–3. Over the course of the next five years, a series of subsequent assignments resulted in two companies, GOM and Cronus, each holding a 50% interest. *Id.* at *3. Before the decommissioning obligation came due, however, Cronus filed for bankruptcy. *Id.* at *4. Accordingly, GOM sought to recoup its decommissioning costs from two intermediate interest holders, both of which had previously been parties to the lease's JOA. *Id.* The JOA stipulated that all parties must bear their share of costs that accrue prior to assigning their interest to a third party. *Id.* at *9. Based on the BOEM regulations and *Seagull Energy*, this court found that (1) the decommissioning obligations accrued when the two intermediate assignees became operators under the JOA, and (2) they could not avoid those liabilities because they did not get an express release when they assigned their interest to the now-bankrupt Cronus. *Id.* at *10–11. Thus, the defendants' liability was based on their previous participation in the JOA and failure to obtain a release from *that* agreement. *Id.* at *9 ("The present case turns on whether the parties to the JOA expressly agreed on the consequences that should follow the assignment of an interest in Block A-16 to a third-party."). Their joint-and-several liability with respect to the government was merely a trigger for the JOA's accrual provision. *See id.* at *9–11.

This Court recently reached a similar result in *Total E&P USA, Inc. v. Marubeni Oil & Gas (USA) Inc.*, No. 4:16-cv-2671 (S.D. Tex. June 28, 2018). Again, however, the determinative question was whether an assignor incurred liabilities under a JOA. *Id.* at *11 ("At issue in this case are two provisions in the [JOA.]"). Like in *GOM Shelf*, this Court looked to the federal regulations and found that the assignor incurred decommissioning liability to the government when it gained its operating interest. *Id.* at *19 ("Under the relevant regulations, the decommissioning obligations accrue 'when [the party] drills a well'"). Because the JOA stipulated that each party must bear its share of the costs that accrue during its ownership period, the defendant's subsequent assignment of its interest did not relieve it of its duties under the JOA. *Id.* at *21–25.

Unlike these cases, Union was never a co-operator with Sojitz under a JOA. Sojitz and ATP signed a JOA, which laid out their relative liability to one another, but Union was not a party to it. In *GOM Shelf* and *Total*, the assignor's liability to the government under the BOEM regulations triggered an additional obligation to pay its proportional share of costs to the co-operators under a JOA. Here, Union is under no such obligation to any co-operators.

Sojitz takes this line of cases too far, arguing that Union's liability through the federal regulation alone—without a controlling JOA—requires Union to reimburse Sojitz for the decommissioning obligations. This argument improperly attempts to convert Union's regulatory liability to the government as contractual liability to Sojitz. But, as discussed further below, federal law does not allow private enforcement of the BOEM

regulations, and Sojitz does not have the contractual hook used to enforce the JOAs under state law in *GOM Shelf* and *Total*.[5]

## B. Sojitz's equitable claims fail as a matter of law and equity.

Facing the federal regulations and contractual language outlined above, which render Sojitz 100% responsible for the decommissioning, Sojitz falls back on multiple equitable claims. Each of them, however, fails as a matter of law.

### 1. Equitable subrogation is not available to enforce BOEM regulations as a private cause of action.

Borrowing its primary cause of action liberally from insurance law, Sojitz claims a right to equitable subrogation—*i.e.*, Sojitz purports to be able to step into the shoes of the government to enforce BOEM's regulations against Union. Tellingly, Sojitz does not cite a single case that would suggests a private company can enforce *a federal agency's* joint-and-several liability scheme through equitable subrogation. Instead, it relies solely on insurance and tort cases that are completely distinguishable from this case. (*See* Mot. at 12–13 (citing *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765 (Tex.

---

[5] Sojitz's claims fail for the independent reason that the indemnification obligations in the Union Agreement constitute a real covenant running with the land. Under Texas law, a real covenant runs with the land when it (1) touches and concerns the land; (2) relates to a thing in existence or specifically binds the parties and their assigns; (3) is intended by the original parties to run with the land; and (4) when the successor to the burden has notice. *Inwood N. Homeowners Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987). Provisions in an oil-and-gas contract may create a real covenant. *E.g.*, *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903 (Tex. 1982). Each of the elements for a real covenant is satisfied here: (1) the indemnification obligations touch and concern land because they pertain to the physical act of capping wells and deconstructing the offshore facilities (*see, e.g.*, Compl. Exs.1 & 2, Leases at ¶ 22); (2) the indemnity obligations specifically provide that "ATP agrees that it will not assign . . . any rights acquired herein without requiring its assignees . . . to expressly assume all obligations owed to Union;" (3) by prohibiting assignments in contravention of Paragraph 8, the Union Agreement specifically manifests the parties' intent that it run with the land; and (4) Sojitz had actual notice of the burdens, which it expressly acknowledged and accepted in the Participation Agreement and the Sojitz Assignments. Further Union and Sojitz are in horizontal privity. Sojitz's reliance on *In re El Paso Refinery, LP* is misplaced because the deciding factor there was that the "covenant d[id] not compel nor preclude the promisor or any subsequent owner from doing anything on the land itself." 302 F.3d 343, 356–57 (5th Cir. 2002). Here, the decommissioning touches and concerns the land because it requires the liable party to physically cap wells and remove any infrastructure.

2007) (suit for subrogation against co-insurer); *Frymire Eng'g Co., Inc. ex rel. Liberty Mut. Ins. Co. v. Jomar Intern., Ltd.*, 259 S.W.3d 140, 143 (Tex. 2008) (suit for subrogation for tort liability based on insurance payment); *Murray v. Cadle Co.*, 257 S.W.3d 291, 294 (Tex. App.—Dallas 2008, pet. denied) (subrogation for judgment creditor's assignee on a mortgage claim)).)

In the decommissioning context, caselaw and BOEM's comments make clear that there is no private right to enforce federal regulations. As explained above, BOEM's joint-and-several liability scheme is separate and distinct from the apportionment of liabilities between contracting parties. In *Fruge*, the Fifth Circuit held that "a violation of the [BOEM] regulations does not give rise to a private cause of action" because the "regulations govern the parties' joint and several liabilities vis-à-vis the Government, not amongst themselves." 337 F.3d at 563. As the Fifth Circuit concluded, it follows that private parties cannot enforce these regulations against one another. *Id.*

Sojitz's closest case to being on point is a bankruptcy case about subordination of creditor claims. (Mot. at 13.) Specifically, Sojitz touts *In re Tri-Union Development Corp.*, 314 B.R. 611 (Bankr. S.D. Tex. 2004) as holding that co-lessees can be subrogated to the claim of MMS. The parties in *Tri-Union*, however, agreed that the payor would be subrogated to MMS's bankruptcy claim, and the court relied on that agreement but did not conduct any independent analysis. *Id.* at 622. Instead, the bankruptcy court questioned whether the co-lessee was subrogated to the police power such that it could enforce that liability. *Id.* To this question, the court answered no. *Id.* (concluding that "the Court finds that this statute and the cases cited by Greenwich do not

subrogate Respondents to the police powers of the MMS"). The remainder of that opinion concerns the bankruptcy-specific question of claim priority. *See id.* at 623–27. Likewise, the federal authorities cited above also prove that Sojitz does not have the police power to enforce BOEM's regulations against Union.

Even if Sojitz could theoretically be subrogated into the shoes of the federal government, the express terms of the operative agreements preclude Sojitz from establishing its claim. Equitable subrogation only applies "when one person confers upon another a benefit that is not required by legal duty or contract." *Smart v. Tower Land & Inv. Co.*, 597 S.W.2d 333, 337 (Tex. 1980). Thus, "an equitable right to subrogation cannot exist where a contract governs the parties' relationship." *Farragut Fin. Corp. v. Capital One Auto Fin., Inc.*, No. 01-07-00497-CV, 2008 WL 4367822, at *3 (Tex. App.—Houston [1st Dist.] Sept. 25, 2008, no pet.); *see Fortis Benefits v. Cantu*, 234 S.W.3d 642, 650 (Tex. 2007) ("We agree with those courts holding that contract-based subrogation rights should be governed by the parties' express agreement and not invalidated by equitable considerations that might control by default in the absence of an agreement."). As is the case with Sojitz's other equitable claims, any theoretical right to equitable subrogation is extinguished by the presence of an express contract. *See Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 308 (5th Cir. 2010) ("[T]he express agreement of the parties controls, and equitable principles do not come into play.") (quoting *Bay Rock Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 298 S.W.3d 216, 225 (Tex. App.—San Antonio 2009, pet. denied)).

## 2. Sojitz's remaining equitable claims for contribution, unjust enrichment, or quantum meruit are incompatible with long-standing Texas law.

Although Sojitz attempts to cast contribution as a broad equitable principle that applies to any shared obligation, Texas courts only allow contribution in two narrow circumstances: co-tortfeasors who are jointly liable for the same injury; and guaranty and surety agreements. *See Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 21 (Tex. 1987) ("The essential prerequisites for a contribution claim are a judgment finding the party seeking contribution to be a joint tortfeasor and the payment by such party of a disproportionate share of the common liability."). Moreover, "Texas courts . . . have not found occasion to extend the contribution right implied in guaranty and surety agreements to other types of contracts." *In re Velocita Worldwide Logistics, Inc.*, 608 F.3d 212, 214 (5th Cir. 2010).

Here, it is obvious that Union cannot be liable for contribution to Sojitz because Union and Sojitz are neither joint tortfeasors nor co-obligors on a note. In any event, Sojitz cannot show that it has been forced to pay "more than [its] fair share on the common obligation or burden." *Velocita*, 608 F.3d at 214. As the contractual analysis above demonstrates, Sojitz's "fair share" of the decommissioning obligations is 100% under the Union Agreement's indemnity clause. Given this, Sojitz cannot claim equitable relief based on contribution.

Sojitz's final theories of recovery—quantum meruit and unjust enrichment— also fail here. "As a general rule, the presence of an express contract bars recovery under quantum meruit." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005);

*Pepi Corp. v. Galliford*, 254 S.W.3d 457, 462 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). "This rule not only applies when a plaintiff is seeking to recover in quantum meruit from the party with whom he expressly contracted, but also when a plaintiff is seeking to recover 'from a third party foreign to the original but who benefited from its performance.'" *Pepi*, 254 S.W.3d at 462 (quoting *Hester v. Friedkin Cos., Inc.*, 132 S.W.3d 100, 106 (Tex. App.—Houston [14th Dist.] 2004, pet. denied)). Unjust enrichment claims, which "are quasi-contractual in nature," also do not apply "when a valid, express contract covers the subject matter of the parties' dispute." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683–84 (Tex. 2000).

Here, there are multiple express contracts that control the subject matter of this dispute. Decommissioning obligations are specifically addressed in the Union Agreement, the Participation Agreement, and Sojitz Assignments. Accordingly, Sojitz's quantum meruit and unjust enrichment claims fail as a matter of law.

## VIII.  CONCLUSION

As discussed above, Sojitz's claim for declaratory judgment fails because it is based on an erroneous construction of the operative agreements. Its equitable claims also fail on the grounds set forth in Union's defense. Union's interpretation of the operative agreements, however, harmonizes and gives effect to all of the terms and provides the only reasonable interpretation considering the documents together. Accordingly, Sojitz's motion for summary judgment should be denied, and Union's cross-motion for summary judgment on its counterclaim for declaratory judgment should be granted.

DATED: September 25, 2018

Respectfully submitted,

/s/ *John V. Anaipakos*

OF COUNSEL:

Meghan Dawson McElvy
Texas Bar No. 24065127
Southern District of Texas No. 1056801
Liam O'Rourke
Texas Bar No. 24098195
Southern District of Texas No. 2802574
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002-4995
Telephone:     713.229.1234
Facsimile:     713.229.1522
meghan.mcelvy@bakerbotts.com
liam.orourke@bakerbotts.com

John V. Anaipakos
Attorney-in-Charge
Texas Bar No. 00786976
Southern District of Texas No. 17762
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002-4995
Telephone:     713.229.1154
Facsimile:     713.229.2754
john.anaipakos@bakerbotts.com


ATTORNEYS FOR DEFENDANT
UNION OIL COMPANY OF CALIFORNIA


# CERTIFICATE OF SERVICE

This certifies that, on September 25, 2018, a copy of the foregoing was electronically submitted with the clerk of the court of the United States District Court for the Southern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served the below counsel of record electronically or by any other manner authorized by Federal Rule of Civil Procedure 5(b)(2).

D. Mitchell McFarland
Carrie Schadle
Munsch Hardt Kopf & Harr, P.C.
700 Milam Street, Suite 2700
Houston, Texas 77002


/s/ *Meghan Dawson McElvy*
Meghan Dawson McElvy